IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **ANNE A.**, and **KATHLEEN A.**,<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED HEALTHCARE INSURANCE COMPANY**, **UNITED BEHAVIORAL HEALTH**, and **THE APPLE, INC. SMALL BUSINESS HEALTH OPTIONS PROGRAM**,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT IN PART AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:20-CV-00814-JNP-DAO<br><br>District Judge Jill N. Parrish<br>Magistrate Judge Daphne A. Oberg |

This action arises under the *Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, et seq.*, and is before the court on the parties' cross-motions for summary judgment. Plaintiffs' complaint alleges two causes of action: (1) recovery of benefits under *29 U.S.C. § 1132(a)(1)(B)* ("ERISA Claim") and (2) violation of the *Mental Health Parity and Addiction Equity Act* under *29 U.S.C. § 1132(a)(3)* ("Parity Act Claim"). Defendants United Healthcare Insurance Company ("United"), United Behavioral Health ("UBH"), and The Apple, Inc. Health and Welfare Benefit Plan, sued herein as the Apple, Inc. Small Business Health Options Program ("the Plan") (collectively, "Defendants") moved for summary judgment on both causes of action on May 10, 2023. That same day, Plaintiffs Anne A. and Kathleen A. ("Kate") (collectively, "Plaintiffs") also moved for summary judgment on both claims.

**BACKGROUND**

Defendants denied benefits allegedly due to Plaintiffs under the Plan, which is an ERISA-

1

governed employee group health benefit plan. ECF No. 54-2, at 77. At all relevant times, Anne was a Plan participant, Anne's daughter Kate was a Plan beneficiary, United was the claims administrator, and UBH was the Plan's designated mental health claim administrator. ECF No. 55, at 1-2.

Plaintiffs obtained care for Kate's mental health at BlueFire Wilderness Program ("BlueFire") and later at Chrysalis, a residential treatment center ("RTC"). ECF No. 56, ¶¶ 24, 31, 41. Plaintiffs sought Plan coverage for Kate's treatment at Chrysalis between April 18, 2016 and December 18, 2017. *Id.* ¶¶ 31, 34. Defendants denied coverage. ECF No. 54-3, at 218-19; ECF No. 54-12, at 306-07. Now, Plaintiffs claim Defendants' wrongful denial of coverage caused them to incur $250,000 in unreimbursed medical expenses. ECF No. 2, ¶ 53.

### The Plan

The Plan offers benefits for medically necessary mental health care, including at RTCs.[1] ECF No. 55, at 5. The Plan only covers services that meet the definition of covered health expenses within Defendants' clinical guidelines for the appropriate level of care. ECF No. 54-1, at 55; ECF No. 54-2, at 165. The Plan gives UBH discretion to make medical necessity determinations and "[t]he fact that a physician or other provider prescribes or orders the service does not, of itself, make such services Medically Necessary." ECF No. 70, at 10; ECF No. 54-2, at 64. UBH used its Optum Level of Care Guidelines, which set out criteria for determining RTC coverage, to review Plaintiffs' benefits claims. ECF No. 54-3, at 215–17. UBH's Guidelines define RTC services as a "sub-acute facility-based program which delivers 24-hour/7-day assessment and diagnostic services, and active behavioral health treatment to members who do not require the intensity of

---

[1] Defendants' motion for summary judgment quotes the Plan's definition of medically necessary services, citing pages UNITED 009869-70 of the administrative record. Those pages do not appear to have been filed with the court along with the remainder of the record. Plaintiffs did not object to Defendants' statement of the Plan's term in their response.

2

nursing care, medical monitoring and physician availability offered in Inpatient." *Id.* at 215. For RTC care to be medically necessary under the UBH Guidelines, the member must require 24-hour/seven days per week treatment for symptoms that interfere with the safety of the insured or others or that would "undermine engagement in a less intensive level of care without the intensity of services offered in" RTC care. ECF No. 54-3, at 215–16.

### Kate's Condition and Treatment

Kate's troubles with depression began in sixth grade, when she attempted to run away, beginning a pattern of self-isolation that led her to stop attending school. ECF No. 54-6, at 399–400. While Kate denied contemplating self-harm, she made repeated statements that indicated suicidal ideation online and to her parents. *Id.* at 401 ("Kate made statements to the effect of 'You would be better without me,' 'You are making me want to kill myself,' 'No one cares about me,' 'No one would miss me if I were gone,' and 'I don't care if all my bones break.'"); *see also id.* at 399.

In early 2015, Kate met with Dr. Wesley Dunn, a psychiatrist who specializes in treating children and adolescents. *Id.* at 403. Their meetings continued for a month, but Kate "said nothing to him" and refused his prescription of an anti-depressant medication. *Id.* On Dr. Dunn's recommendation, Kate's parents took her to an eating disorder specialist, Dr. Carlton. *Id.* at 404. While her meeting with Dr. Carlton was "terrible[,]" Kate was not diagnosed with an eating disorder and the family ultimately learned that Kate had not been engaging in self-harm. *Id.*

Near the end of seventh grade, Kate was admitted at BlueFire, an outdoor behavioral health program that offered treatment for children with mental health challenges. *Id.* at 399. Shortly thereafter, a BlueFire therapist recommended a psychological evaluation, which Dr. Jeremy A. Chiles conducted in May of 2015. *See id.* at 398-415. Dr. Chiles diagnosed Kate with "Persistent

Depressive Disorder, moderate to severe" and "Generalized Anxiety Disorder, moderate." *Id.* at 413. Based on the evaluation, Dr. Chiles recommended that Kate be "placed in all all-girls residential treatment center" following her time at BlueFire. *Id.* Such treatment would "provide Kate with ongoing support, structure, and nurturance to work on and lessen the impact of anxiety and depression, find a direction to pursue in the future, improve relationships with family members, and develop social skills." *Id.* at 413-14.

Kate did not obtain RTC care immediately upon leaving BlueFire. *Id.* at 561. However, her parents "spent weeks calling, applying, and working with United to find a facility that might be available for Kate if needed." *Id.* Kate saw different therapists but ultimately decided she would only speak with Dr. Dunn, whom she had been seeing periodically since early 2015. *Id.*

Kate's situation worsened around her eighth-grade Christmas break. At that time, she "begged [her parent, D.] to send her away to live somewhere else, that her life has no hope, that she is useless, and that no one should care about her." *Id.* at 562. When Kate's parents realized "nothing was helping" her, Kate's mother Anne took months off work to try to find doctors or RTCs that might be able to help. *Id.* at 563. On January 19, 2016, Dr. Dunn completed a form supporting Anne's application for family medical leave from work, writing that "Kate should not be left alone for extended periods of time due to depression and suicidal thoughts" and "needs to be under near constant observation given high suicidal risk and impulsive behavior." *Id.* at 530–532. Molly Baron, a therapeutic placement consultant, recommended that Kate return to BlueFire for a month, which she did. *Id.* at 563. Kate's parents spent that month working with Ms. Baron to find an RTC that would serve Kate's needs, and they settled on Chrysalis. *Id.*

Kate was admitted at Chrysalis on April 18, 2016, and received a psychosocial assessment the following day from a therapist, Dr. Becca Wineka. ECF No. 54-4, at 17–19. The next month,

4

Kate met with Dr. Houser, a psychiatrist, who wrote of his suspicion that Kate remained "quite anxious" and that she might benefit from an OCD workbook to discuss in therapy. *Id.* at 32. Kate ultimately received treatment at Chrysalis until December 18, 2017. ECF No. 54-6, at 564; ECF No. 54-11, at 190–91. In September of 2017, Kate's long-time psychiatrist, Dr. Dunn, reiterated his opinion from early 2016, writing that he was "not . . . comfortable treating [Kate] on an outpatient basis. Kate's degree of depression requires residential treatment." ECF No. 54-6, at 417. Dr. Dunn expressed "full support" of Kate's treatment at Chrysalis based on his time as her psychiatrist. *Id.* Dr. Dunn later restated this position in a letter dated December 9, 2018. ECF No. 54-11, at 143–44.

### *Denial of Benefits and Prelitigation Appeals*

Plaintiffs first sought coverage for Kate's RTC care at Chrysalis in December 2016. ECF No. 54-11, at 229–30; *see also* ECF No. 54-3, at 224–25. On November 22, 2017, Defendants issued their first denial letters, drafted by Dr. Libus, a reviewing physician. ECF No. 54-3, at 218–19 (denial letter for coverage between April 18, 2016 and March 31, 2017); ECF No. 54-12, at 306–07 (denial letter for coverage between May 1, 2017 and December 18, 2017).[2] The letters

---

[2] The court identified at least three issues regarding the period of Plan coverage that Defendants' denial letters intended to address. Based on the reasons below, the court concludes the relevant period of Plan coverage contested by the parties is from April 18, 2016 until March 31, 2017 and from May 1, 2017 until December 18, 2017.

First, Defendants' initial denial letter purported to limit its period of review to April 18, 2016 through March 20, 2017. ECF No. 54-3, at 218. However, the body of this letter and all successive appeals of that decision expanded the period of review to also cover March 21, 2017 through March 31, 2017. *See id.*; *see also* ECF No. 54-6, at 572 (first appeal); 54-12, at 315 (second appeal); ECF No. 54-11, at 170 (external appeal). Defendants appear to have agreed to this point in their briefs. *See* ECF No. 55, at 8.

Second, Defendants "asked the provider for more information" about Plaintiffs' claim for coverage in April of 2017 and "didn't receive it on time." ECF No. 54-11, at 883–89. Plaintiffs have not contested that determination. The court therefore focuses only on Defendants' denial of coverage before March 31, 2017 and after May 1, 2017.

Third, Defendants' denial letters were also inconsistent about Plaintiffs' claim for benefits in May of 2017. *Compare* ECF No. 54-12, at 306 (initial denial letter denying coverage in May of 2017 based on medical necessity) *with* ECF No. 54-8, at 678 *and* ECF No. 54-11, at 161 (later denial letters claiming Plaintiffs never claimed Plan benefits for Kate's treatment in May of 2017). The court could find Defendants' claim denials arbitrary and capricious based on these shifting rationales. But because it would find Defendants acted arbitrarily and capriciously whether May of 2017

5

stated that UBH reviewed the services provided by Chrysalis and found them not medically necessary because Kate's condition "did not meet criteria" for RTC treatment and "could be treated in a less intensive Level of Care."[3] *Id.* The second letter reached the same conclusion on a similar basis. *See* ECF No. 54-12, at 306. The letters both asserted that the decisions were reached by application of the "Optum Level of Care Guidelines for the Mental Health Residential level of care" after "review of your child's medical record."[4] ECF No. 54-3, at 218–19; ECF No. 54-12, at 307.

On May 18, 2018, Plaintiffs submitted a first appeal of Defendants' denial of claims. ECF No. 54-4, at 235. This 40-page appeal letter was also accompanied by roughly 1,700 pages of exhibits, mostly made up of Kate's medical records from her time at Chrysalis. The attached exhibits also included Kate's Chrysalis admission application (ECF No. 54-6, at 370–96); Dr. Chiles' psychological evaluation and assessment of Kate (*id.* at 397–415); Dr. Dunn's September 14, 2017 letter of medical necessity, expressing his opinion that Kate needed residential treatment and could not be treated only on an outpatient basis (ECF No. 54-6, at 417); and Dr. Dunn's form

---

were included or not, the court will presume that Defendants' initial position was correct, and that the parties are contesting Plaintiffs' claim for benefits from May 1, 2017 until December 18, 2017.

[3] The court focuses only on the issue of medical necessity because Defendants appear to have abandoned the other justifications for denying benefits raised in their denial letters. For example, on July 21, 2017, Defendants issued an Explanation of Benefits purporting to deny coverage between January 1, 2017 and March 31, 2017 because Plaintiffs' claim for that period "wasn't submitted on time according to the healthplan's timely filing rules." ECF No. 54-4, at 286–89. Plaintiffs' first appeal letter contested this conclusion. ECF No. 54-4, at 237. Subsequently, Defendants appear to have abandoned their contention and instead defend their decisions denying benefits for that period only on medical necessity grounds. See ECF No. 55, at 10–11.

[4] The first denial letter justified its decision with the following conclusions:

> \* Your child was not feeling like harming himself or others.
> \* Your child was not hearing or seeing things that others don't.
> \* Your child was able to look after her day to day needs.
> \* Your child did not have severe medical problems that would require this level of care.
>
> She was willing and able to participate in her treatment. She had supportive family. . . . [Y]our child could continue care in the Mental Health Outpatient setting with medication management, individual and family therapy.

ECF No. 54-3, at 218–19.

6

completed on January 19, 2016 for Anne's family medical leave application (ECF No. 54-6, at 530–32). Plaintiffs' first appeal urged Defendants to support their response to the appeal with "specific evidence from the supplied documentation" to satisfy the requirement that Defendants "[p]rovide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim[.]" ECF No. 54-4, at 426. Plaintiffs argued in the appeal that Defendants' findings communicated in their denial letters failed to take Kate's medical history into account, and that if Defendants had considered them, they would not have denied coverage. *Id.* at 273–74.

On June 20, 2018, Defendants responded to Plaintiffs' first appeal with a letter by a new reviewing physician, Dr. Randall L. Solomon, who upheld the initial denial of benefits for April 18, 2016 through March 31, 2017. ECF No. 54-6, at 572–77. Dr. Solomon reiterated the prior reviewer's position, but provided new reasons for denying benefits as well, including his conclusion that Chrysalis was a "therapeutic boarding school" that didn't provide RTC care. *Id.* at 573. On September 12, 2018, Defendants sent Plaintiffs an additional letter by another reviewing physician, Dr. Michael Soto, upholding the denial of benefits for June 1, 2017 through December 18, 2017. ECF No. 54-8, at 678–83.[5] Dr. Soto repeated the prior reviewers' conclusions that Kate's "condition did not meet criteria for this level of care" and she "could be treated in a less intensive level of care[.]" *Id.* Dr. Soto's letter then repeated the conclusions stated in Dr. Libus's original denial letters. *See id.* at 573.

---

[5] Defendants sent this letter responding to Plaintiffs' first appeal after Plaintiffs submitted their second appeal. In response, Defendants wrote that "[t]he appeal requested a second level appeal, but we have not completed a first level appeal on this issue. Therefore, we handled this case as a first level appeal." ECF No. 54-8, at 680. Nonetheless, the letter affirmed that "[a]s part of our review of the appeal, we looked at the documentation submitted" and other information provided. *Id.* at 678. The court understands Defendants to have claimed in this letter that in affirming they reviewed the "documentation submitted," that includes the documentation submitted as exhibits attached to Plaintiffs' second appeal.

Plaintiffs submitted a second appeal on August 13, 2018. ECF No. 54-6, at 555–65. Plaintiffs reiterated their position on the medical necessity of Kate's RTC care and requested that Defendants explain the basis of their disagreement with the opinions of Kate's medical care providers in their response. *Id.* at 564. Defendants sent a second letter to Plaintiffs on September 12, 2018 that also relied on Dr. Soto's medical necessity opinion outlined in the preceding letter to uphold the initial denial of benefits for dates April 18, 2016 through March 31, 2017 for a second time, responding to Plaintiffs' second appeal. ECF No. 54-12, at 315–25. This letter communicated that Plaintiffs had exhausted their internal appeals for this period. *Id.* Completing their response to Plaintiffs' second appeal, Defendants sent a June 13, 2019 letter upholding the claims denial for dates June 1, 2017 through December 18, 2017 based on the opinion of another reviewing physician, Dr. Joan Odom.[6] ECF No. 54-11, at 161–68. This letter communicated that Plaintiffs had exhausted their internal appeals for this period as well. *Id.* at 163.

On January 3, 2019, Plaintiffs requested an independent external review of Defendants' denials of Plaintiffs' internal appeals. ECF No. 54-8, at 694–711.[7] Plaintiffs requested that the reviewing party "carefully consider all of the information which we have taken the time to provide

---

[6] Dr. Odom's decision rested on the following conclusions:

> [You were] admitted for the treatment of depression and anxiety.
>
> After reviewing the case notes, it is noted [your] condition did not meet guidelines for coverage of treatment in this setting. [You] had stable mental and physical health. [You] did not want to harm [yourself] or others. [Your] behavior was safe. [You] did not need around-the-clock monitoring and care in order to make progress with treatment.
>
> [Your] care and recovery could have taken place in the mental health outpatient setting.

ECF No. 54-11, at 162.

[7] Plaintiffs' request for an external appeal pre-dated Defendants' response to Plaintiffs' second appeal for the period between May 1, 2017 and December 18, 2017. As a result, Defendants treated Plaintiffs' request for an independent external review as a request for a second internal appeal for the period between June 1, 2017 and December 18, 2017. ECF No. 54-11, at 161. The external reviewer, therefore, only conducted a review of the initial claims denials and subsequent appeals for the period between April 18, 2016 and March 31, 2017. ECF No. 54-11, at 170.

8

for your review." *Id.* at 697. On June 17, 2019, Plaintiffs received a letter from a case review coordinator, licensed in psychiatry and employed by the Medical Review Institute of America, LLC, upholding the denial of benefits in Defendants' internal appeals.[8] ECF No. 54-11, at 169–176. After exhausting the available prelitigation appeal opportunities, Plaintiffs filed this ERISA action on November 19, 2020. ECF No. 2.

**LEGAL STANDARD FOR SUMMARY JUDGMENT**

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." However, when both parties move for summary judgment in an ERISA proceeding focusing on a benefit denial claim, the parties have effectively "stipulated that no trial is necessary" and thus "summary judgment is merely a vehicle for deciding the case." *LaASMAR v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (citation omitted). In these instances, "the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor." *Id.* (citation omitted). If the court's

---

[8] The external reviewer reached this decision based on the following conclusions:

> As of 4/18/16, the patient was noted to be depressed. The patient was not actively suicidal, homicidal, psychotic, self injurious, aggressive or acutely manic. There was no indication the patient was at a dangerously low body weight. There was no indication of abnormal vital signs or laboratory results at the time of admission. The patient had no previous hospitalizations or treatment other than outpatient level of care and wilderness therapy. There was no indication for around the clock monitoring. Treatment could have been addressed at a lower level of care.
>
> Based on the above, the patient did not meet the Optum Level of Care Guidelines: Mental Health Conditions criteria for coverage of mental health residential treatment services from 4/18/16-3/31/17. There are no clinical circumstances unique to this particular patient that would make it medically necessary based on current medical literature.
>
> The appeal letter from the patient's parents, as well as the facility and outpatient provider, outline the history of mood and anxiety issues, as well as outpatient treatment and wilderness therapy.
>
> Based on the above, the prior determination is upheld.

ECF No. 11, at 173.

9

analysis reaches the Parity Act Claim, a different standard is applied. The court affords no special deference to the claim administrator in the legal question of interpretating the Parity Act. *See Joseph F. v. Sinclair Servs. Co.*, 158 F. Supp. 3d 1239, 1258 (D. Utah 2016) (citing *Foster v. PPG Indus. Inc.*, 693 F.3d 1226, 1233 (10th Cir. 2012)).

ANALYSIS

    I. ERISA CLAIM

    A. STANDARD OF REVIEW

When a claim administrator holds discretionary authority to determine benefits eligibility, a reviewing court applies "a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious." *Weber v. GE Grp. Life Assurance Co.*, 541 F.3d 1002, 1010 (10th Cir. 2008) (citations omitted). An administrator with discretionary authority may delegate its discretion to a third party, whose denial decisions are then also reviewed under an arbitrary and capricious standard. *Geddes v. United Staffing Alliance Employee Medical Plan*, 469 F.3d 919, 926–27 (10th Cir. 2006). Here, the parties do not dispute that the Plan gives United discretionary authority to determine benefits eligibility, that United holds the right to delegate that discretion under the Plan, or that United used that delegatory authority to designate UBH as the Plan's claims administrator. *See* ECF No. 55, at 18–19. Arbitrary and capricious review is thus appropriate.

Claim denials are upheld on arbitrary and capricious review if "reasonable and supported by substantial evidence." *D.K. v. United Behavioral Health*, 67 F.4th 1224, 1235 (10th Cir. 2023), *cert. denied*, 2024 U.S. LEXIS 748, 218 L. Ed. 2d 24 (citing *Adamson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006)); see also *David P. v. United Healthcare Ins. Co.*, 77 F.4th 1293 (10th Cir. 2023) (quoting *Graham v. Hartford Life & Acc. Ins. Co.*, 589 F.3d 1345, 1357-58 (10th Cir. 2009)) ("We define substantial evidence as 'such evidence that a reasonable

mind might accept as adequate to support the conclusion reached by the decision-maker. Substantial evidence requires more than a scintilla but less than a preponderance.'"). A coverage decision lacks substantial evidence if it rejects and fails to explain why it disagrees with opinions from a plaintiff's medical providers, *D.K.*, 67 F.4th at 21, if it fails to sufficiently explain its conclusions with supportive reasoning and citations to the record, *id.* at 29–30, or if it "is not grounded [on] any reasonable basis[,]" *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1193 (10th Cir. 2007) (citations and internal quotation marks omitted), *abrogated on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008).

A coverage decision's reasonableness is further judged on whether it resulted from a "reasoned and principled process." *D.K.*, 67 F.4th at 18 (quoting *Flinders*, 491 F.3d at 1193). To avoid having their claim denials found arbitrary and capricious, ERISA administrators are obliged to engage in a "full and fair review" of benefits claims and appeals, considering the insured's records and sufficiently explaining their decision. *See* 29 C.F.R § 2560.503-1(h)(2)(iii)-(iv). "ERISA denial letters play a particular role in ensuring full and fair review[,]" so "[a] district court [is] correct to focus its review on the denial letters" when evaluating whether an insurer conducted a full and fair review. *D.K.*, 67 F.4th at 1239. To avoid a finding that a denial of benefits was arbitrary and capricious, ERISA administrators must engage in "reasonable, 'meaningful dialogue'" in the denial letters they issue. *Id.* at 1240 (citing *Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997)). Meaningful dialogue requires denial letters to be "comprehensive and include requests for additional information, steps claimants may take for further review, and specific reasons for the denial." *Id.* at 1239 (citing 29 C.F.R. § 2560.503-1(f)(3); 29 C.F.R. § 2560.503-1(h)(3), (4)). In accordance with ERISA's objective of facilitating meaningful dialogue regarding benefits denials, the court will limit its review of Defendants' claim

denials to the information conveyed to Plaintiffs in the prelitigation claims and appeals process. *See Ian C. v. UnitedHealthCare Ins. Co.*, 87 F.4th 1207, 1226 (10th Cir. 2023) ("Finally, United insists that its reviewers' internal notes are properly a part of the administrative record for Ian C.'s claim. Our recent disposition in *D.K.* forecloses this argument. . . . Only the rationales articulated to the beneficiary in the denial letter are eligible for review[.]").

### B. DEFENDANTS ARBITRARILY AND CAPRICIOUSLY DENIED PLAN BENEFITS FOR KATE'S TREATMENT AT CHRYSALIS

Plaintiffs assert Defendants' coverage denials were arbitrary and capricious because they failed to engage in the meaningful dialogue required by ERISA's claim procedures when responding to Plaintiffs' medical records and treating physicians' opinions throughout the prelitigation appeals process. ECF No. 56, at 26; ECF No. 71, at 7; ECF No. 75, at 8. Plaintiffs also argue Defendants acted arbitrarily and capriciously by issuing denial letters that were "vague, conclusory, and threadbare" and inadequately explained their decisions with reference to Kate's medical records. ECF No. 56, at 30; ECF No. 75, at 4. The court agrees on both points.

#### i. *Defendants' Denial of Coverage for Kate's Care at Chrysalis was Arbitrary and Capricious Because Defendants Disregarded the Opinions of Kate's Medical Care Providers*

Plan administrators need not "seek out all treating care givers' opinions found in a claimant's medical records and explain whether or not the plan administrator agrees with each of those opinions and why." *David P.*, 77 F.4th at 1312. But when an insured responds to a denial of benefits with opinions from their medical providers that they required a certain treatment, the insurer cannot "shut their eyes to readily available information" and "fail[] to engage with the opinions of [Plaintiffs'] treating care givers[.]" *Id.* at *31. Instead, their duty is to "address medical

12

opinions, particularly those which may contradict their findings. This is the core of meaningful dialogue[.]" *D.K.*, 67 F.4th at 1241.[9]

In *D.K.*, the court credited an insured's attempts to engage in a meaningful dialogue about the necessity of care by referencing medical providers' opinions in their prelitigation appeals and requesting the insurer justify their coverage decision with reference to them. *Id.* at 1240. The court affirmed that the insurer's denial letters were arbitrary and capricious when they only mentioned those opinions in passing without "wrestl[ing] with medical advice" contrary to their findings. *Id.* at 1241. A claim denial would be arbitrary and capricious, the court explained, if the insurer "refused to credit and effectively 'shut their eyes' to the medical opinions of [Plaintiffs'] treating physicians" and "the depth of an administrator's engagement with medical opinion would be revealed only when the record is presented for litigation." *Id.*

Similarly, Plaintiffs attempted to engage in a meaningful dialogue about Kate's medical needs. Plaintiffs responded to Defendants' denial letters by specifically referencing Kate's medical care providers' opinions regarding her needs and requesting that Defendants review the whole record in responding to their internal and external appeals. *See, e.g.,* ECF No. 54-6, at 413 (Dr. Chiles' recommendation that Kate's condition would require residential treatment after leaving BlueFire); ECF No. 54-6, at 530–32 (Dr. Dunn's statement in Anne's family medical leave application that Kate "needs residential placement" because she "should not be left alone for extended periods of time due to depression and suicidal thoughts" and "needs to be under near

---

[9] The parties dispute the significance of *D.K.* in this case. Plaintiffs find the case indistinguishable and "dispositive here." ECF No. 71, at 10. Defendants attempt to distinguish the case by noting that their internal and external reviewers were of unanimous agreement in denying benefits, contrasting the reviewers' reversal of opinion in *D.K.*, and that Kate received positive treatment notes while at Chrysalis, which Defendants claim prove Kate did not have "decidedly complex" medical care needs and was not suicidal. ECF No. 70, at 28–29. But the facts that distinguish this case from *D.K.* subtract nothing from its central holding: ERISA requires insurers to engage in a full and meaningful prelitigation dialogue regarding the denial of benefits, which must include actual explanation of benefits denials that grapple with contrary evidence presented to the claims administrator, including treating physicians' opinions. *D.K.*, 67 F.4th at 1241. In this case, Defendants plainly failed to do so.

13

constant observation given high suicide risk and impulsive behavior"); ECF No. 54-6, at 417 (Dr. Dunn's letter expressing "full support" of Kate receiving RTC treatment). Plaintiffs asked Defendants to explain their coverage decision with regard to these records. ECF No. 54-6, at 564.

Defendants did not have to defer to these opinions, but they couldn't ignore them. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003). Yet that is exactly what Defendants did. Defendants' ineffectively argue that they met their duty simply by unanimously denying benefits through internal and external appeals and that courts in the past have upheld benefits denials on similar facts. *D.K.* changed the standard this court must apply when reviewing Defendants' decisions, limiting the court's review to information that Defendants communicated to Plaintiffs prior to litigation. 67 F.4th at 1241. The court declines to follow the district court opinions Defendants cite from other jurisdictions, which held that ERISA arbitrary and capricious review should be based on the whole medical record, including the insurer's internal notes, when a different rule applies in this jurisdiction.

Defendants' obligation, then, was to at least address the opinions of Kate's providers in their denials, particularly because they contradict the conclusions Defendants drew. *D.K.*, 67 F.4th at 1241; *cf. E.W. v. Health Net Life Ins. Co.*, 86 F,4th 1265, 1300–01 (10th Cir. 2023) (declining to apply *D.K.* where a plaintiff does not argue that an insurer failed to "engage with opinions from . . . treating physicians"). On this point, Defendants fell far short. Their treatment of Dr. Dunn's opinions is indicative of these failings. Defendants denied coverage based on medical necessity. ECF No. 54-3, at 218-19; ECF No. 54-12, at 306. Plaintiffs' first appeal provided Kate's medical records, including Dr. Dunn's opinion that Kate's condition and suicide risk necessitated residential care. ECF No. 54-6, at 530–32. Defendants ignored that letter in their response. *See* ECF No. 54-6, at 572–77; ECF No. 54-8, at 678–83. Defendants' subsequent reviewers all repeated

14

this mistake, jumping to conclusions that directly conflicted with Kate's care providers' opinions without addressing any of the supportive documentation she provided in her appeals. *See* ECF No. 54-12, at 315–25; ECF No. 54-11, at 161–68; ECF No. 54-11, at 173.

Defendants insist that their four internal reviewers and the external reviewer all denied benefits "based on their thorough review of Kathleen's medical recorders and all other documents submitted in support of Plaintiffs' claim[.]" ECF No. 55, at 22. But the meaningful dialogue demanded of ERISA fiduciaries like the Defendants requires them to "*address* medical opinions, particularly those which may contradict their findings" *in their denial letters*. *D.K.*, 67 F.4th at 1241 (emphasis added). Post-hoc rationales claiming Defendants denied benefits based on a careful review of Kate's medical records cannot save their coverage decision when none of the denial letters addressed the reliable evidence Plaintiffs provided that contradicted Defendants' conclusions. In short, Defendants' contention that "nothing in the record here evidences a lack of engagement by the medical reviewers" appears to be mistaken.[10] The court finds Defendants acted arbitrarily and capriciously in denying Plaintiffs' benefits claims while shutting their eyes to readily available information from Kate's providers.

> ii. *Defendants' Denial of Coverage for Kate's Care at Chrysalis was Arbitrary and Capricious Because Defendants Failed to Sufficiently Explain Their Coverage Decisions*

The court finds Defendants' failure to sufficiently explain their denials of benefits to be a

---

[10] This point is illustrated by Defendants' continued failings to adequately review and respond to Kate's medical records that Plaintiffs supplied in their prelitigation appeals. Even now, Defendants continue to argue there "is no evidence in the record that Dr. Dunn made" the statements Plaintiffs cited in their internal appeals. ECF No. 70, at 26; ECF No. 74, at 4. But Dr. Dunn's letter submitted in Anne's family medical leave application is plainly documented in the record. *See* ECF No. ECF No. 54-6, at 417 and 530–32. It appears as though Defendants not only failed to meet their duty under ERISA to review Plaintiffs' appeals and the attached information, addressing contrary opinions from Kate's medical providers—Defendants *still* argue that their coverage decisions were based on a full and fair review of the record while they make baseless arguments before the court about the availability of evidence that was unquestionably before them since Plaintiffs' first appeal in 2018.

15

second basis for concluding those denials were arbitrary and capricious. When denying benefits claims, administrators are required to do more than simply review the record and issue a decision consisting of their conclusions. "Rather, ERISA procedural regulations require the administrator 'provide the claimant with a comprehensible statement of reasons for the [initial] denial.'" *D.K.*, 67 F.4th at 1242 (quoting *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 635 (10th Cir. 2003)). A claim administrator's statements and health conclusions cannot simply be conclusory—they must be "backed up with reasoning and citations to the record." *Id.* (citing *McMillan v. AT&T Umbrella Benefit Plan No. 1*, 746 F. App'x 697, 705-06 (10th Cir. 2018)).

In their denial letters, Defendants provided several reasons for their denials of Plaintiffs' benefits claims and prelitigation appeals. Among these are conclusions that Kate "did not require 24/7 supervision," ECF No. 54-12, at 306, that she "was not feeling like harming [her]self," ECF No. 54-3, at 218, and that she "could continue care in the mental health outpatient setting," ECF No. 54-12, at 316. None of these assertions were supported by citations to Kate's medical records, and none explained the reasoning that led Defendants to discount Kate's providers' opinions regarding the necessity of her RTC care. The first denial letter is typical of the group. Defendants assured they had "reviewed [Kate's] medical record" before asserting she "was not feeling like harming himself or others" and "did not have severe medical problems that would require this level of care." ECF No. 54-3, at 218. While Defendants stated they reviewed Kate's records, they didn't truly provide "any analysis, let alone a reasoned analysis[,]" because their denials consisted of conclusory assertions, contradicted by parts of the record, with no reasoning as to what information was relied on, which pieces of Kate's medical records Defendants found persuasive, or what parts of Kate's medical history were in fact reviewed. *See D.K.*, 67 F.4th at 1242. Defendants' claims denials were arbitrary and capricious because they failed to provide sufficient

16

reasoning, supported by citations to Kate's medical records.[11]

## II. PARITY ACT CLAIM

Plaintiffs' second claim is that Defendants violated the Parity Act by requiring Kate to display acute mental health symptoms before they would consider granting benefits for RTC care while applying a lesser standard to residential admission for analogous non-mental health care. ECF No. 56, at 36. The court cannot decide the Parity Act Claim on the possibility of a future denial of benefits. *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 580-581 (1985) (holding that Article III does not grant courts power to decide potential controversies that rest upon "contingent future events that may not occur as anticipated, or indeed may not occur at all"). With no basis to know whether Defendants will continue to deny coverage on remand or whether Kate will need RTC care in the future, the court finds this question premature. *See Theo M. v. Beacon Health Options*, 631 F.S Supp. 3d 1087, 1110-11 (D. Utah 2022); *David P. v. United Healthcare Ins. Co.*, 564 F. Supp. 3d 1100, 1123 (D. Utah 2021).

## III. REMEDY

Plaintiffs ask the court not to "trust Untied to provide a full and fair review on remand[.]" ECF No. 75, at 19. Generally, however, remand to the plan administrator for renewed evaluation is the appropriate remedy when the court finds an ERISA violation on the grounds of inadequate factual findings or explanation of the grounds of a plan administrator's decision to deny benefits.

---

[11] The record contains other evidence of Defendants' insufficient explanations. For example, Defendants first argued that Chrysalis was not a properly licensed residential treatment center in their response to Plaintiffs' first appeal. ECF No. 54-6, at 572–77. In their second appeal, Plaintiffs disputed this conclusion, arguing that Chrysalis could not have obtained its Montana licensure as a private alternative adolescent residential treatment facility unless it was a residential treatment facility within the terms of the Plan. ECF No. 54-6, at 556–57. In response, Defendants' reviewer simply concluded that "[t]he . . . services provided did not meet Optum level of care guidelines for residential treatment. Also, some of the therapies provided are considered non-standard modes of treatment for residential treatment center." ECF No. 54-12, at 316. No further explanation was provided. The reviewer gave no reasoning as to why Plaintiffs' argument in their second appeal was unpersuasive, and their conclusion was not supported by citations to details of Kate's medical records. Defendants' failure to provide any reasoning on this point further underlines the conclusion that their claims denials were arbitrary and capricious for lack of sufficient explanation.

*David P.*, 77 F.4th at 1315. In some cases, however, the court has discretion to instead reverse and award benefits outright. *Id.* (stating the court may reverse if the record "clearly shows that the claimant is entitled to benefits") (citation omitted); *D.K.*, 67 F.4th at 1244 (stating the court may reverse if necessary to deny the plan administrator another "bite at the apple" when "clear and repeated procedural errors" in denying benefits claims threaten their ability to act as a proper fiduciary) (citation omitted). While additional guidance from the Tenth Circuit would be helpful in determining when a district court may award benefits, and when it should simply remand to the claim administrator, remand appears to be the appropriate remedy here.

On remand, there are some safeguards in place to discourage Defendants from simply repeating the ERISA violations outlined in this Order. Defendants are obligated to conduct their review on remand based only on rationales that were both raised in the administrative record and communicated to Plaintiffs prior to the initiation of this litigation. *David P.*, 77 F.4th at 1315-16 (citing *Carlile v. Reliance Standard Life Ins. Co.*, 988 F.3d 1217, 1229 (10th Cir. 2021)) ("[R]emand . . . does not 'provide the plan administrator the opportunity to reevaluate a claim based on a rationale not raised in the administrative record . . . and not previously conveyed to Plaintiffs.'"). On remand, Defendants therefore cannot rely on any of the post-hoc reasons for denying benefits that they raised for the first time before this court. They are obligated to limit their review only to the rationales for denying benefits that they stated in their denial letters.

In ruling that Defendants are limited to their prelitigation "rationales" on remand, the court further rules that "rationales" in this context means the specific pieces of evidence cited in Defendants' denial letters upon which they denied Plaintiffs' benefits claims. Unquestionably, plan administrators "must provide claimants with the rationales for denial prior to litigation because plan administrators who 'have available sufficient information to assert a basis for denial of

18

benefits, but choose to hold that basis in reserve rather than communicate it to the beneficiary,' preclude the claimant from 'full and meaningful dialogue regarding the denial of benefits.'" *D.K.*, 67 F.4th at 1241 (quoting *Spradley*, 686 F.3d at 1140 (citation and quotation omitted)). Otherwise, claimants could be "denied timely and specific explanations and be 'sandbagged by after-the-fact plan interpretations devised for purposes of litigation.'" *Id.* (quoting *Flinders*, 491 F.3d at 1191 (citation and quotation omitted)). If Defendants were now free on remand to read the opinions of medical necessity from Kate's care providers, sort through her medical records that Plaintiffs repeatedly provided in the prelitigation appeals process, and find new evidence therein to justify their decision to deny benefits, it would deny the prelitigation meaningful dialogue in which Defendants were obliged to engage. On remand, Defendants can review Plaintiffs' claims based on medical necessity, of course. But they may only justify a denial of benefits on that basis using the reasons and citations to Kate's medical records that were included in the prelitigation denial letters—and the denial letters contained no such citations. This is the cost of Defendants' failure to meet their obligation to support their decision denying benefits with "reasoning and citations to the record[.]" *David P.*, 77 F.4th at 1312 (quoting *D.K.*, 67 F.4th at 1242)).[12]

This court is familiar with cases like this one and is sympathetic to Plaintiffs' concern that regardless of this Order, Defendants may provide no more a full and fair review on remand. Often in these cases, the insurer cursorily denies benefits through inadequate denial letters, requiring the insureds to jump through hoops, including an internal appeals process and costly litigation to

---

[12] The court recognizes this Order may turn the remand procedure into an exercise in futility. The court has held that Defendants' decision to deny benefits, on the grounds outlined in their denial letters, was arbitrary and capricious. Relying on those same rationales to deny benefits on remand would be arbitrary and capricious a second time. But those are the only rationales Defendants may rely upon, because granting them another opportunity to engage in a more searching inquiry of Kate's medical records would undermine the purpose of the meaningful dialogue ERISA requires. Further clarification from the Tenth Circuit on how to address this conundrum, and when exactly the court may award benefits, would obviate some of the difficulties this case presents. *Compare* D.K., 67 F.4th at 1243-44 (awarding benefits due to ERISA procedural violations similarly to those present in this case) *with* David P., 77 F.4th at 1312-15 (reversing this court for awarding benefits in another analogous case).

obtain a court order, which only results in the remand of the case to the same insurer to deny benefits again, now based on better reasoning. This practice flouts insurers' fiduciary duties under ERISA. But because Defendants' claim denials were primarily arbitrary and capricious for violating ERISA's requirements of addressing contrary medical opinions and sufficiently explaining their reasoning, the court orders remand as the remedy most likely appropriate here.

**ORDER**

For the foregoing reasons, the court **DENIES** Defendants' motion for summary judgment and **GRANTS** Plaintiffs' motion for summary judgment in part. Specifically:

1. Defendants' motion for summary judgment on Plaintiffs' ERISA Claim is **DENIED**.
2. Plaintiffs' motion for summary judgment on their ERISA Claim is **GRANTED**.
3. Plaintiffs' motion to reverse Defendants' denial of benefits is **DENIED**.
4. The court does not address the parties' cross-motions for summary judgment on the Plaintiffs' Parity Act Claim.
5. This matter is **REMANDED** to Defendants for further consideration consistent with this Memorandum Decision and Order.

SIGNED March 26, 2024

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge