Amanda Shafer Berman (admitted *pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: 202.688.3451
aberman@crowell.com

Amy M. Pauli (admitted *pro hac vice*)
CROWELL & MORING LLP
1601 Wewatta Street, Suite 815
Denver, CO 80202
Telephone: 303.524.8660
apauli@crowell.com

Michael H. Bernstein, #17941
ROBINSON & COLE LLP
666 Third Avenue
Chrysler East Building, 20th Floor
New York, NY 10017
Telephone: 212.451.2940
mbernstein@rc.com

*Attorneys for Defendants UnitedHealthcare
Insurance Company, United Behavioral Health,
and Apple, Inc. Health and Welfare Benefit Plan*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ANNE A. and KATHLEEN A., | Case No. 2:20-cv-00814-JNP |
| Plaintiffs, | **DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** |
| v. | Judge Jill N. Parrish |
| UNITED HEALTHCARE INSURANCE COMPANY, UNITED BEHAVIORAL HEALTH, and THE APPLE, INC. SMALL BUSINESS HEALTH OPTIONS PROGRAM, | Magistrate Judge Daphne A. Oberg |
| Defendants. | |

## TABLE OF CONTENTS

Page

I.      INTRODUCTION AND RELIEF SOUGHT ................................................................. 1

II.     STATEMENT OF UNDISPUTED MATERIAL FACTS .................................................. 3

        A.      The Plan Provides Coverage for Medically Necessary Services ........................ 3

        B.      Plaintiffs' Claim for Benefits for Kate's Long-Term Residential Treatment at
                Chrysalis and Lawsuit ................................................................................ 7

        C.      Summary Judgment and United's Remand Decisions ..................................... 8

                1.      The Court's Summary Judgment Decision ................................................ 8

                2.      United's Remand Decisions ................................................................... 8

III.    STANDARD OF REVIEW ....................................................................................... 12

IV.     ARGUMENT ....................................................................................................... 14

        A.      The Court Should Review the Entire Administrative Record When Deciding
                Whether United Correctly Denied Benefits. ................................................. 14

        B.      United Correctly Denied Benefits Under Both the Arbitrary and Capricious and
                De Novo Standards of Review. .................................................................... 18

                1.      Dr. Fischer and Dr. Cristobal engaged in a meaningful dialogue with
                        Plaintiffs and their providers' positions and reasonably concluded that
                        Kate could have been treated at a lower level of care .............................. 19

                        i.      Kate's residential treatment at Chrysalis was not medically
                                necessary. ................................................................................ 19

                        ii.     Dr. Fischer and Dr. Cristobal engaged with Kate's medical record
                                and explained why they disagreed with her treating providers'
                                opinions that residential treatment was appropriate ...................... 23

                2.      Even if the court undertook de novo review, the record shows that United
                        rightly denied coverage. ...................................................................... 28

i

V.    CONCLUSION ..................................................................................................... 30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adamson v. Unum Life Ins. Co.*,
  455 F.3d 1209 (10th Cir. 2006) ...................................................................................14, 18

*Alexandra H. v. Oxford Health Ins., Inc.*,
  763 F. App'x 865 (11th Cir. 2019) .....................................................................................23

*Allison M. v. Mueller Indus., Inc. Welfare Benefit Plan*,
  No. 23- 00421, 2025 WL 674769 (D. Utah Mar. 3, 2025) ..................................................16

*Amy G. v. United Healthcare*,
  No. 17-00427, 2018 WL 2303156 (D. Utah May 21, 2018) ...............................................22

*Anne M. v. United Behav. Health*,
  No. 18- 808, 2022 WL 3576275 (D. Utah Aug. 19, 2022).................................................29

*Black & Decker Disability Plan v. Nord*,
  538 U.S. 822 (2003)............................................................................................................27

*Buffonge v. Prudential Ins. Co. of Am.*,
  426 F.3d 20 (1st Cir. 2005)................................................................................................15

*Caldwell v. Life Ins. Co. of N. Am.*,
  287 F.3d 1276 (10th Cir. 2002) ...............................................................................15, 16, 17

*Carlile v. Reliance Standard Life Ins. Co.*,
  988 F.3d 1217 (10th Cir. 2021) ....................................................................................14, 17

*Crawford v. Guar. State Bank & Tr. Co.*,
  No. 22-2542, 2024 WL 2700668 (D. Kan. May 24, 2024)..................................................16

*David P. v. United Healthcare Insurance Co.*,
  77 F.4th 1293 (10th Cir. 2023) ....................................................................2, 14, 16, 17

*DeGrado v. Jefferson Pilot Fin. Ins. Co.*,
  451 F.3d 1161 (10th Cir. 2006) .........................................................................................15

*E.W. v. Health Net Life Ins. Co.*,
  86 F.4th 1265 (10th Cir. 2023) .........................................................................................24

*Elliott v. Metro. Life Ins. Co.*,
  473 F.3d 613 (6th Cir. 2006) .............................................................................................15

*Firestone Tire & Rubber Co. v. Bruch,*
    489 U.S. 101 (1989).................................................................13

*Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.,*
    491 F.3d 1180 (10th Cir. 2007) ...............................................13

*Foster v. PPG, Indus.,*
    693 F.3d 1226 (10th Cir. 2012) ...............................................13

*Ian C. v. UnitedHealthcare Ins. Co.,*
    87 F.4th 1207 (10th Cir. 2023) ................................................15

*Isbell v. Unum Life Ins. Co. of Am.,*
    No. 23-1351, 2025 WL 40379 (10th Cir. Jan. 7, 2025)....................25, 27

*Kimber v. Thiokol Corp.,*
    196 F.3d 1092 (10th Cir. 1999) .......................................14, 18, 19

*Kirsten W. v. Cal. Physicians' Serv.,*
    No. 19- 00710, 2025 WL 447890 (D. Utah Feb. 10, 2025)...................16

*LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment &
    Dependent Life Ins. Plan,*
    605 F.3d 789 (10th Cir. 2010) ...........................................12, 13

*Mark M. v. United Behav. Health,*
    No. 18-00018, 2020 WL 5259345 (D. Utah Sept. 3, 2020)................22, 23

*Metro. Life Ins. Co. v. Glenn,*
    554 U.S. 105 (2008)................................................................13

*Nance v. Sun Life Assurance Co. of Can.,*
    294 F.3d 1263 (10th Cir. 2002) ...............................................14

*R.E. v. Blue Cross Blue Shield of Ill.,*
    No. 22-00296, 2023 WL 8936274 (D. Utah Dec. 27, 2023) ..............16

*Rademacher v. Colo. Ass'n of Soil Conservation Dists. Med. Benefit Plan,*
    11 F.3d 1567 (10th Cir. 1993) ................................................13

*Rekstad v. U.S. Bancorp,*
    451 F.3d 1114 (10th Cir. 2006) ...........................................15, 17

*Richard K. v. United Behav. Health,*
    No. 18 CIV.6318, 2025 WL 869715 (S.D.N.Y. Mar. 20, 2025) ...........30

*Rizzi v. Hartford Life & Accident Ins. Co.,*
    383 F. App'x 738 (10th Cir. 2010) ...........................................13

*Sandoval v. Aetna Life & Cas. Ins. Co.*,
967 F.2d 377 (10th Cir. 1992) ..........................................................................14

*Spradley v. Owens-Illi. Hourly Emps. Welfare Benefit Plan*,
686 F.3d 1135 (10th Cir. 2012) ........................................................................14

*Tracy O. v. Anthem Blue Cross Life & Health Ins. Co*,
807 F. App'x 845 (10th Cir. 2020) ...................................................................23

*Weber v. GE Grp. Life Assurance Co.*,
541 F.3d 1002 (10th Cir. 2008) ........................................................................15

*Woolsey v. Marion Labs, Inc.*,
934 F.2d 1452 (10th Cir. 1991) ........................................................................14

**Statutes**

29 U.S.C. §1001, *et seq.*.......................................................................................1

29 U.S.C. § 1132(a)(1)(B) .................................................................................1, 7

29 U.S.C. § 1132(a)(3).......................................................................................1, 7

29 U.S.C. § 1133(2) .............................................................................................16

Employee Retirement Income Security Act of 1974 (ERISA)............................. *passim*

Mental Health Parity and Addiction Equity Act....................................................1

**Other Authorities**

29 C.F.R. § 2560.503-1(g)(1)(v)(B) ...................................................................24

Federal Rule of Civil Procedure 56 ......................................................................1

Utah Civil Rules 56-1 and 7-1(a)(3) .....................................................................1

Pursuant to Federal Rule of Civil Procedure 56 and United States District Court for the District of Utah Civil Rules 56-1 and 7-1(a)(3), Defendants UnitedHealthcare Insurance Company, sued herein as "United Healthcare Insurance Company" ("UHIC"), United Behavioral Health ("UBH") (UHIC and UBH together, "United"), and the Apple Inc. Health and Welfare Benefit Plan, sued herein as the Apple Inc. Small Business Health Options Program ("Plan") (together, "Defendants") respectfully move this Court for an order granting summary judgment in their favor.

The court should dismiss Plaintiffs' Anne A. and Kathleen A.'s (together, "Plaintiffs") claims for an award of Plan benefits pursuant to 29 U.S.C. § 1132(a)(1)(B), for "other appropriate equitable relief" pursuant to 29 U.S.C. § 1132(a)(3), and for violation of the Mental Health Parity and Addiction Equity Act ("MHPAEA") with prejudice. In support of this motion, Defendants incorporate by reference the facts and arguments made in Defendants' concurrently filed Opposition to Plaintiffs' Renewed Motion for Benefits, Attorneys' Fees, Prejudgment Interest, and Costs ("Opp.") and state as follows:

## I.    INTRODUCTION AND RELIEF SOUGHT

In this dispute under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §1001, *et seq.* ("ERISA"), United correctly denied Plaintiffs' claims for coverage of mental health care services for Plaintiff Kathleen A. (referred to in prior decision and pleadings as "Kate") received at Innerchange Chrysalis ("Chrysalis"), a residential treatment center, from April 18, 2016 through December 18, 2017. The Plan grants United, as its claim administrator, full discretion to determine whether the Plan covers a claim for mental health and substance use treatment. United's decision on remand therefore merits deference, and judgment should be entered for Defendants because the benefit decision was not arbitrary and capricious. And even if

United's remand decision is examined de novo, the record supports the conclusion the administrator reached on remand.

On remand, United found that residential treatment was not medically necessary for Kate during the period at issue and explained why based on the record. Two board-certified doctors in Adult and Child and Adolescent Psychiatry, Dr. Kenneth Fischer and Ronald S. Cristobal, reviewed Kate's file and found that, though she may have required additional treatment, she did not require residential-treatment-level care and could have stepped down to partial hospitalization or intensive outpatient care. Plaintiffs' Renewed Motion for Benefits, Attorneys' Fees, Prejudgment Interest, and Costs ("Mot.") Ex. A at 10; *see also* Opp. Ex. 1, Aug. 21, 2024 Dr. Kenneth J. Fischer Letter p. 2. Drs. Fischer and Cristobal thoroughly reviewed and cited Kate's medical records in discussing their coverage decisions (Mot. Ex. A at 7-9; Opp. Ex. 1 pp. 7-12), and they explained why they disagreed with Kate's contrary provider opinions, (Mot. Ex. A at 8-9; Opp. Ex. 1 pp. 7-12). Dr. Cristobal also addressed the arguments Plaintiffs asserted in their remand appeal letter. Mot. Ex. A at 7-9. Dr. Fischer's and Dr. Cristobal's reasoned analyses easily met ERISA's procedural requirements and provided the missing explanations for which Plaintiffs faulted United's prelitigation denial letters.

United's reviewers thoroughly explained why continued residential treatment was not medically necessary based on the record. Under ERISA and Tenth Circuit precedent, United was permitted to further assess and explain its decision on remand. The Tenth Circuit explained in *David P. v. United Healthcare Insurance Co.*, 77 F.4th 1293, 1315 (10th Cir. 2023), and other cases that, on remand after a court finds that an initial decision was inadequately explained, administrators must "further, and proper[ly]" consider the benefits claim. That is consistent with the widely accepted rule in this circuit that administrators may not advance new denial rationales

on remand but may further explain the basis for their original denial rationale. And this Court acknowledged that "remand to the plan administrator for renewed evaluation is the appropriate remedy when the court finds an ERISA violation on the grounds of inadequate factual findings or explanation of the grounds of a plan administrator's decision to deny benefits." Order at 17, ECF No. 80 ("Order"). A remand where the administrator may not provide additional explanation or cite additional record support for its decision would be, as this Court recognized, "an exercise in futility." Order at 19 n.12.

Because United's benefits denial is thoroughly explained in its remand decisions, fully supported by the record, and consistent with United's prelitigation benefits determinations, the Court should enter judgment for Defendants.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.    The Plan Provides Coverage for Medically Necessary Services

1.    The Plan is an employee welfare group health insurance plan governed by ERISA. AR 308, 653; Compl., ¶ 5.

2.    The Plan is self-funded by Apple Inc. AR 295, AR 308, AR 640, AR 653; Compl., ¶ 5.

3.    At all relevant times, Plaintiff Anne A. was a member/participant in the Plan and Plaintiff Kate was a beneficiary under the Plan.  Compl., ¶ 5.

4.    UHIC is one of the claim administrators under the Plan. A UHIC affiliate, UBH, is the designated Mental Health and Chemical Dependency claim administrator under the Plan.  AR 47, AR 308, AR 388, AR 653.

5.    The Plan provides that "[t]he plan administrator (or its delegate) for each plan has the sole and absolute discretionary authority to construe and interpret the plan, supply omissions, correct any defect, and determine all questions regarding the eligibility for as well as the amount of benefits. In this regard, the plan administrator's decisions shall be conclusive and binding on all persons."  A R

295-96, AR 640.

6.      The Plan provides coverage for Mental Health and Chemical Dependency services rendered by in-network and out-of-network providers, as long as the care received is deemed Medically Necessary. Specifically, the Plan provides that "Medical Benefits will be provided only for expenses incurred for the Medically Necessary diagnosis and direct care and treatment of an illness, disease, or injury for which benefits are payable under this Plan . . . The determination of Medical Necessity will be made by the Claims Administrator, in its sole discretion, and such determination will be conclusive and binding. The fact that a physician or other provider prescribes or orders the service does not, of itself, make such services Medically Necessary."  AR 9869.

7.      The Plan further specifies that "Medically Necessary" or "Medical Necessity" means "those services or supplies provided by a hospital, physician, or other provider, which are:

(A)      appropriate for the treatment of the diagnosed symptoms, condition, disease, illness, or injury;

(B)      provided for the diagnosis or the direct care and treatment of the condition, disease, illness, or injury;

(C)      in accordance with the standards of good medical practice;

(D)      for treatment within the scope of the hospital's, physician's, or other provider's service license;

(E)      not primarily for the convenience of a covered individual's physician or other provider;

(F)      not court-ordered treatment;

(G)      not treatment for professional growth;

(H)      effective or efficient treatment; and

(I)      the most appropriate supply or level of service which can safely be provided to the covered individual."

AR 9869-70.

8.      The Plan provides for two levels of mandatory internal administrative appeal with UBH, as well as a voluntary external review with an independent external review agency. AR 301-06, AR 646-51.

9.      The Plan provides coverage for medically necessary services for both mental health/substance use and medical/surgical conditions, and those services fall on a continuum of intensity. Inpatient hospital care is the highest level of intensity, which is appropriate for patients who need acute care or have an issue of such severity that it must be treated in that setting.  AR 9870.

10.      Intermediate services are the next level of intensity and include residential treatment for mental health, skilled nursing facilities ("SNF"), or inpatient rehabilitation facilities ("IRF"). AR 50, 391. Intermediate services provide 24-hour care but are less restrictive than hospital care. *Id.*

11.      For residential treatment to be medically necessary under the Plan, the member must require 24- hour/seven days per week treatment for symptoms that interfere with the member's or others' safety or that would "undermine engagement in a less intensive level of care without the intensity of services offered in" residential treatment. AR 689-90.

12.      Residential treatment services are only medically necessary if the member's condition is not so severe that the member requires the more intensive services provided in a hospital setting. AR 689 (noting that residential treatment is appropriate for members who require active behavioral health treatment, but do not "require the intensity of nursing care, medical monitoring and physician availability offered in Inpatient").

13.      Thus, if the member's condition is not so severe that the member requires 24-hour supervision, residential treatment would not be medically necessary. AR 689.

14.      Similarly, services at a SNF/IRF are medically necessary when "[t]here are no acute *hospital care* needs," but "[t]he patient has intense and complex care needs that make recovery facility care safer and more practical" than care at a lower level. AR 8236 (emphasis added).

15.      With respect to mental health, the Plan provides coverage for outpatient care that provides numerous hours of intensive services per week in non-24-hour settings, including a partial

hospitalization program ("PHP"). AR 43, AR 385, AR 7678-81.

16.    The Plan also provides coverage for intensive outpatient programs ("IOP") for members who are experiencing moderate signs and symptoms. AR 385.  Finally, at the lowest intensity, the Plan covers outpatient services provided in an office setting. *Id*.

17.    The Plan uses certain guidelines to determine the medical necessity of services that reflect the principles set out above. AR 54, AR 322, AR 396, AR 667.

18.    United used Optum Level of Care Guidelines for Residential Treatment Center Mental Health Conditions ("LOC Guidelines" or "LOCG") to review Plaintiffs' request for residential treatment benefits. AR 689-91.

19.    The LOC Guidelines described the criteria for coverage of residential treatment level of treatment. *Id.*

20.    United developed the LOC Guidelines using a hierarchy of clinical evidence to evaluate criteria to be incorporated into the guidelines. *See* AR 9836-38 (Medical Technology Assessment Committee ("MTAC") Charter ("MTAC Charter") (describing guideline development)) and AR 9845, AR 9847-50 (Optum Behavioral Health Clinical Technology Assessments (noting that evidence is graded from meta-analyses to professional opinions)).

21.    At the time of Plaintiffs' claims, United used the 20th and 21st Edition of the Milliman Care Guidelines ("MCG") to evaluate the medical necessity of SNF/IRF level of care.  *See* AR 7872-AR 9821.

22.    Like the LOC Guidelines, Milliman developed the MCG using a hierarchy of clinical evidence to evaluate criteria to be incorporated into the guidelines. *See* AR 9827-31 (MCG Summary of Guideline Development Policies and Procedures ("MCG Dev. P&P") (describing

guideline development and noting that evidence is graded from meta-analyses to professional opinions)).

23.    The LOC Guidelines and the MCG list the sources upon which they are based and were reviewed annually. AR 691 (LOCG); AR 9836-38 (MTAC Charter); AR 8239-41 (MCG SNF); AR 9827-31 (MCG Dev. P&P).

24.    United retired the LOC Guidelines on January 31, 2020. United now uses The American Association of Community Psychiatrists CALOCUS-CASII Child and Adolescent Level of Care/Service Intensity Utilization System (CALOCUS-CASII) to review coverage for mental health services, including residential treatment services. Opp. Ex. 1 pp. 3-4.

**B.    Plaintiffs' Claim for Benefits for Kate's Long-Term Residential Treatment at Chrysalis and Lawsuit**

25.    Kate was admitted to Chrysalis on April 18, 2016, at the age of 13. AR 6488, AR 6489.

26.    Kate was diagnosed with dysthymic disorder, generalized anxiety disorder, and parent-child conflict. AR 6495.

27.    Plaintiffs sought a retrospective medical necessity review of their claim for Plan coverage of Kate's residential treatment. AR 6488.

28.    Under the administrative appeals process the Plan provides, four expert physician reviewers and an independent external reviewer analyzed Plaintiffs' benefits claim and concluded that Kate's treatment at Chrysalis was not medically necessary. AR 692-93; AR 2668-69; AR 2660-63; AR 4483-86; AR 4472-75; AR 6419-21; AR 6428-31 (external).

29.    On November 19, 2020, Plaintiffs sued Defendants in federal court in Utah for recovery of benefits under 29 U.S.C. § 1132(a)(1)(B) and for a violation of the Mental Health Parity and Addiction Equity Act under 29 U.S.C. § 1132(a)(3).

### C.    Summary Judgment and United's Remand Decisions

#### 1.    The Court's Summary Judgment Decision

30.    On March 26, 2024, after cross-motions for summary judgment, the Court granted partial summary judgment in favor of Plaintiffs and remanded the benefits determination to United—but it did not award benefits. ECF No. 80 at 18. Instead, the Court explained that "remand to the plan administrator for renewed evaluation is the appropriate remedy when the court finds an ERISA violation on the grounds of inadequate factual findings or explanation of the grounds of a plan administrator's decision to deny benefits." Order at 17. On that basis, it determined that "remand appears to be the appropriate remedy here." *Id.* at 18.

31.    The Court set certain restrictions on the scope of United's remand, which were not immediately appealable because the remand order was not a final order, so United proceeded with the remand decision.

#### 2.    United's Remand Decisions

32.    Following the Court's remand, on June 5, 2024, Plaintiffs submitted a Level One appeal letter to United.

33.    On August 21, 2024, Dr. Kenneth J. Fischer, a board-certified physician with expertise in Child and Adolescent Psychiatry, issued a denial letter. That letter is attached as Exhibit 1 to this Opposition ("Opp. Ex. 1"). Dr. Fischer reviewed several materials to reach his decision, which he listed in his letter, including Kate's medical records at BlueFire and Chrysalis, as well as her treating providers' opinions, among other documents. Opp. Ex. 1 pp. 4-5.

34.    In evaluating Plaintiffs' Level One remand appeal, Dr. Fischer used two evaluation criteria: CALOCUS-CASII for Level 5, which is applicable for the mental health residential level of care; and the LOC Guidelines.

35.    Dr. Fischer concluded that Kate's treatment at Chrysalis was not medically

necessary from April 18, 2016 forward. Summarizing his decision, Dr. Fischer wrote that when Kate "was admitted to Innerchange Chrysalis, the member's signs and symptom and psychosocial factors had acutely improved as noted following successful completion a month of BlueFire Wilderness Therapy." Opp. Ex. 1 p. 7.

36.    Dr. Fischer wrote a single-spaced, 6.5 page "[r]ationale" for this decision that explained why he upheld the denial of benefits. *Id.* at 7-13. He observed that, when Kate was discharged from BlueFire on April 14, 2016, just a few days before her Chrysalis admission:

> The member was generally described as happy, cooperative, in a good mood, interacting with peers and completing her schoolwork. She had been responding to limits, challenges and setbacks by using coping skills or by asking adults for support within a reasonable period of time She had mostly stayed emotionally regulated and had stayed safe when emotionally dysregulated. She had not been requiring more frequent intensive staff interventions to co-regulate and/or contain emotional dysregulation. She was thinking clearly and had no bizarre beliefs. She had not been hostile, threatening or intimidating resulting in a fear response in others. She had not been exhibiting poor or intrusive boundaries resulting in anger response in others and requiring staff intervention. She was getting solid grades in school and her teachers liked her. Her functional status was sufficient in that with appropriate adult support, the member had been capable of collaborating with adults, attending school, and participating in recommended community treatment. (3. FMC4_1747_BlueFireWildernessMedRecs_3.14.16-4.14.16_NPBF)

*Id.* at 10.

37.    Dr. Fischer also noted that Kate's admission paperwork (completed May 9, 2016) showed her reason for admission was for "'her history of school refusal, withdrawn behavior, low self-esteem, body image, and black and white thinking.'" Other identified areas of concern included self acceptance, and family relations." *Id.* at 11. But when she was admitted on April 18, 2016, Dr. Fischer observed that the records reflected that:

> her mood, level of worry and social anxiety did not appear to seriously impact her ability to understand and participate in treatment programming or require 24-hour supervision. Having just successfully completed a month of wilderness therapy, 24/7 monitoring in a supervised RTC setting was not needed to address concerns outlined at the time of Innerchange Chrysalis admission. (Exhibit N: Chrysalis Medical Records pages 1466-1467)

*Id.*

38.     Dr. Fischer also wrote that, following Kate's experience at BlueFire, the record

shows she was ready to step down in care:

> By April 18, 2016, following successful completion [of] a month of BlueFire
> Wilderness Therapy on April 14, 2016, this member appeared to be at a point where
> her demonstrated Cognitive Behavior Therapy and Dialectical Behavior Therapy skills
> of distress tolerance, affect regulation, mindfulness and other coping skills could have
> been safely and effectively practiced in a non-24-hour care intensive outpatient setting.
> This level of care would be appropriate when around-the-clock behavioral care is not
> necessary and the needed type and frequency of evidence-based treatments are
> available in intensive outpatient program but not in office or clinic setting. Such non-
> 24-hour care would be preferably near home (for direct family engagement as Dr.
> Chiles had recommended), with continued med management, individual therapy
> (Cognitive Behavior Therapy/Dialectical Behavior Therapy), standard school
> adjustments (standard Individual Education Plan or 504 plan) and what would be long
> term family dynamics work (outpatient family work or Intensive In Home services),
> with any potential isolated incidents handled with crisis intervention and other available
> community supports (wraparound services, Mental Health Partial Hospital Program or
> Mental Health Inpatient). This would have helped to monitor and maintain stability,
> continue to increase functioning (especially given her dependent personality traits
> identified), develop a support system and further strengthen key relationships with
> friends and treatment professionals, while integrating her back into family and
> community life. (Exhibit N: Chrysalis Medical Records)

*Id.* at 13. He further explained that "[t]his continuum of mental health care should have been seen

as a fluid treatment pathway, where she may enter treatment at any level and be moved to more or

less-intensive settings or levels of care as her changing clinical needs dictate." *Id.* at 12.

39.     Dr. Fischer also concluded that Kate's Chrysalis records show that her

residential treatment was not medically necessary:

> The factors leading to the parents' immediate decision to admit this member to
> Innerchange Chrysalis could have been safely, efficiently, and effectively assessed
> and/or treated in a less intensive setting following successful completion [of] a month
> of BlueFire Wilderness Therapy during which time the member's signs and symptoms
> and psychosocial factors had acutely improved as noted. But there were no apparent
> behavioral management challenges requiring 24-hour care and supervision. She
> showed no evidence of acute impairment of emotion, behavior or cognition that
> interfered with her activities of daily living to the extent her welfare or others was
> endangered.  . . . She was no longer at a concerningly low body weight as in the past.
> There were no abnormal vital signs or labs or other concerning medical issues needing

10

24-hour RTC care and supervision. Indeed, she did not meet criteria for an eating disorder, and there had been no formal eating disorder diagnoses given at any time during the two BlueFire Wilderness Therapy stays or at Innerchange Chrysalis (there was speculation of a potential single instance of purging on 5/28/16, but no compensatory eating disorder related concerns persisted in the record). She had immediately been able to participate in group therapy, equine therapy, individual therapy, and family therapy and medication management. She attended school at Innerchange Chrysalis and finished her 8th grade, Freshman credits as well as a portion of her sophomore credits. (Exhibit N: Chrysalis Medical Records)

During the first several months of her Innerchange Chrysalis stay, she was noted to be generally calm and cooperative, motivated and engaged, responsive to staff, and doing reasonably well. She was eating, sleeping and independently doing her daily activities. She would subsequently go on excursions, and ride and train daily with horses. She had been making safe decisions and had not exhibited risky impulsiveness. She had been demonstrating safety during onsite visits and off-site passes with family and had exhibited no more risky behavior than the family could sustainably manage and did reasonably well in that environment (member away from treatment during period December 17, 2016 through January 3, 2017).

. . .

The progress notes from her entire Innerchange Chrysalis stay are unremarkable and reflect a standard long term treatment model. She attended school and cared for herself appropriately. They show member is compliant with treatment protocols, is active in the community and engages in recreational activities such as skiing, hiking, watching movies and completes her residential chores. The member had not been engaging in treatment rejecting behavior of such a degree that such acts would represent a barrier to treatment in the community. The psychiatric medication regimen was still being adjusted to address symptoms, side effects, and could have been safely managed in the community and did not prevent successful return to the community. Though member demonstrated occasional periods of regression, these behaviors were not unusual for prolonged residential stays.

Like her time at wilderness described above, she had mostly stayed emotionally regulated, and had stayed safe when emotionally dysregulated. Despite her underlying identified dependent personality traits, she had not been requiring more frequent intensive staff interventions to co-regulate and/or contain emotional dysregulation. She had demonstrated her ability to utilize coping skills during times of distress and seek out trusted staff to process and communicate regarding them. (Exhibit N: Chrysalis Medical Records)

40.    Dr. Fischer noted that, according to her Chrysalis treatment plan, Kate was to

receive "1 Individual Therapy session, 1 Family session via skype, and 3 Groups per week," which

Dr. Fischer described as "characteristic of an outpatient or intensive outpatient service intensity,

not 24-hour residential treatment." *Id.* at 11. He also observed that:

> The necessary elements of the initial and ongoing treatment plans at Innerchange Chrysalis did not appear from admission forward, to require a facility-based program which delivers 24-hour/7-day assessment and diagnostic services, and active behavioral health treatment to continue with recovery. For most teens similarly situated to this member, the clinical research is clear that what matters most is the integration of all the necessary elements of treatment, not whether they are specifically delivered in a structured residential setting. (Exhibit N: Chrysalis Medical Records)

*Id.* at 12.

41.    On November 7, 2024, Plaintiffs submitted a Level Two appeal.

42.    By letter on February 20, 2025, Dr. Ronald S. Cristobal, a board-certified physician in Adult Psychiatry and Child and Adolescent Psychiatry, responded to Plaintiffs' Level Two appeal; that letter is reproduced in full in Plaintiffs' Motion and therefore Defendants do not repeat its text here. *See generally* Mot. 15-28; *see also* Mot. Ex. A. In short, Dr. Cristobal wrote a thorough, 9-page analysis that cited repeatedly to the administrative record and discussed Kate's providers' contrary opinions, ultimately "determin[ing] that residential treatment was not necessary for the member from April 18, 2016, onward." Mot. Ex. A at 2.

## III.    STANDARD OF REVIEW

Where the parties in an ERISA case both move for summary judgment, "summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor." *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (internal quotation marks and citation omitted). As the party seeking benefits, the plaintiff has the burden "to establish a covered loss." *Id.* at 800 (citation omitted).

Before reaching the merits, the Court must decide which standard of review applies. *Id.* at 796. Although generally "a denial of benefits challenged under [ERISA] must be reviewed under

a *de novo* standard" of review, this requirement does not apply when "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 110 (2008); *Foster v. PPG, Indus.*, 693 F.3d 1226, 1231 (10th Cir. 2012). In that event, the arbitrary and capricious standard of review applies to a challenge of an ERISA benefits determination, and courts "uphold an administrator's decision so long as it is predicated on a reasoned basis." *Rizzi v. Hartford Life & Accident Ins. Co.*, 383 F. App'x 738, 748 (10th Cir. 2010) (internal quotation marks and citation omitted). That is the case here, where the Plan explicitly gives the administrator discretion to construe its terms and determine eligibility for benefits. AR 295-96, AR 640 (plan gives the administrator the "the sole and absolute discretionary authority to construe and interpret the plan, supply omissions, correct any defect, and determine all questions regarding the eligibility for as well as the amount of benefits," and states that United's "decisions shall be conclusive and binding on all persons").

Under the arbitrary and capricious standard of review, the Court must defer to United's benefits decision and may not set it aside so long as it was "reasonable and made in good faith." *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1189 (10th Cir. 2007) (internal quotation marks and citation omitted) (overruled on other grounds). Plan interpretations and decisions having "any reasonable basis will be upheld; it need not be the only logical or even the best decision." *Rademacher v. Colo. Ass'n of Soil Conservation Dists. Med. Benefit Plan*, 11 F.3d 1567, 1570 (10th Cir. 1993). Courts may not "substitute [their] judgment for the judgment of the [Administrator] unless the actions of the [Administrator] are not grounded on *any* reasonable basis." *Woolsey v. Marion Labs, Inc.*, 934 F.2d 1452, 1460 (10th Cir. 1991) (internal

quotation marks and citation omitted). "This standard is a difficult one for a claimant to overcome." *Nance v. Sun Life Assurance Co. of Can.*, 294 F.3d 1263, 1269 (10th Cir. 2002).

## IV.    ARGUMENT

### A.    The Court Should Review the Entire Administrative Record When Deciding Whether United Correctly Denied Benefits.

When reviewing a denial of ERISA benefits, the court is to consider the "administrative record as a whole." *Adamson v. Unum Life Ins. Co.*, 455 F.3d 1209, 1212 (10th Cir. 2006); *see also Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 380 (10th Cir. 1992) ("district court . . . may consider only the arguments and evidence before the administrator at the time it made that decision"). Under arbitrary and capricious review, this includes answering whether a Plan administrator's decision is "sufficiently supported by facts within [its] knowledge to counter a claim that it was arbitrary or capricious." *Kimber v. Thiokol Corp.,* 196 F.3d 1092, 1098 (10th Cir. 1999) (internal quotation marks and citation omitted). This means that the Court should review the entirety of the administrative record when deciding whether United correctly denied benefits, including the entirety of both remand decisions.

The Tenth Circuit has explained that deciding which remedy is appropriate – benefits or remand – "depends upon the specific flaws in the plan administrator's decision." *David P.*, 77 F.4th at 1315. For over two decades, the Tenth Circuit has held that remand is the right remedy when "the administrator fail[s] to make adequate factual findings or fail[s] to adequately explain the grounds for the decision." *Id.* (quoting *Carlile v. Reliance Standard Life Ins. Co.*, 988 F.3d 1217, 1229 (10th Cir. 2021)); *Spradley v. Owens-Illi. Hourly Emps. Welfare Benefit Plan*, 686 F.3d 1135, 1142 (10th Cir. 2012) (noting remand is more appropriate where plan administrator failed to make adequate factual findings or failed to explain adequately the grounds for its decision to deny benefits); *Weber v. GE Grp. Life Assurance Co.*, 541 F.3d 1002, 1015 (10th Cir. 2008) (same);

*DeGrado v. Jefferson Pilot Fin. Ins. Co.*, 451 F.3d 1161, 1176 (10th Cir. 2006) (same); *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1289 (10th Cir. 2002) (same).

Where an initial decision was inadequately explained, the Tenth Circuit has thus ruled that, on remand, administrators like United should get a chance to provide "further findings or explanation." *Caldwell*, 287 F.3d at 1288. Such "further findings or explanation" include the interpretation of previously uninterpreted plan terms and additional "findings of fact." *Id.* at 1289 (remanding with directions to make further findings of fact where there were "no" denial reasons set out in prelitigation appeals letters); *DeGrado*, 451 F.3d at 1176 (remanding to administrator for "further findings" on the issue of Plaintiff's "work status" on which it "failed to make adequate factual findings" during the prelitigation appeals process). This rule stems from the courts' recognition that they are not "medical specialists and that judgment is not ours to make." *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 622–23 (6th Cir. 2006); *see also Rekstad v. U.S. Bancorp*, 451 F.3d 1114, 1121 (10th Cir. 2006) (Court would "not substitute [its] judgment for that of U.S. Bancorp."). That makes sense because "ERISA is not a punitive statute." *Buffonge v. Prudential Ins. Co. of Am.*, 426 F.3d 20, 31 n.15 (1st Cir. 2005); *see also cf. Ian C. v. UnitedHealthcare Ins. Co.*, 87 F.4th 1207, 1217 (10th Cir. 2023) (rejecting Plaintiffs' counsel's argument that administrator should lose benefit of arbitrary and capricious standard of review where administrator did not "strictly adhere[]" to ERISA regulations) (alteration in original). So "[t]he appropriate response" to a claimant deprived of process during prelitigation appeals is not to exact a cost on United, but "to let [the claimant] have the benefit of an untainted process." *See Buffonge*,

426 F.3d at 31 n.15. A remand directing an administrator to correct the prior gaps in process does just that.[1]

Applying the Tenth Circuit's clear mandate, other courts in this district have permitted administrators to supplement their reasoning supporting a denial decision on remand so long as the denial rationale remains the same. *Allison M. v. Mueller Indus., Inc. Welfare Benefit Plan*, No. 23- 00421, 2025 WL 674769, at *16 n.185 (D. Utah Mar. 3, 2025) (applying *David P.* and, on remand, directing administrator to "provide meaningful explanation regarding if Blue Ridge is excluded under the Plan's terms and MCG Guidelines"; "be specific and to reference relevant record materials"; "engage with Plaintiffs' medical records"; and "engage with and provide record citations to facts that support and contradict its ultimate benefits determination"); *Kirsten W. v. Cal. Physicians' Serv.*, No. 19- 00710, 2025 WL 447890, at *15 (D. Utah Feb. 10, 2025) (applying *David P.* and on remand, directing administrator to "engage with Plaintiff's medical records and argument on appeal that contradict the notion that C.W. was cooperative with his treatment, did not express signs of oppositional or disruptive behavior, and was unlikely to relapse with outpatient treatment" and "engage with C.W.'s letters of medical necessity and address whether and how these letters affect its ultimate benefits determination").

On remand here, United did precisely what the Tenth Circuit and other courts in this district have directed is appropriate: it more thoroughly explained why continued residential treatment

---

[1] Permitting United to supplement the explanation supporting its original denial rational on remand is also consistent with ERISA's requirement of a "full and fair review". *See* 29 U.S.C. § 1133(2). *See Caldwell*, 287 F.3d at 1289 (directing "the district court to remand to the LINA administrator for a full and fair review of the record in light of the 'any occupation' standard"); *R.E. v. Blue Cross Blue Shield of Ill.*, No. 22-00296, 2023 WL 8936274, at *13 (D. Utah Dec. 27, 2023) ("[T]he court remands to Blue Cross to conduct a full and fair review of Plaintiffs' claim in accordance with the Plan and ERISA's procedural requirements."); *Crawford v. Guar. State Bank & Tr. Co.*, No. 22-2542, 2024 WL 2700668, at *23 (D. Kan. May 24, 2024) ("[T]he Court remands to the Board to conduct a full and fair review[.]").

was not medically necessary, maintaining the same overall reason for denying benefits (lack of medical necessity as the Plan defines that term) while providing additional record support and explanation for that conclusion. United's remand decisions are thus in line with *David P.* and other circuit case law directing remand where an initial decision was not sufficiently explained or supported.

In contrast, a rule precluding administrators from further explaining their decision and engaging with the record on remand—even when the basis for the remand was a lack of sufficient explanation and record citation—would make any remand an award of benefits. With those limits, the administrator could not rehabilitate its decision and thus would face the choice of either going through the remand process for no reason or simply awarding benefits outright even where the record does not support that outcome. That result contradicts longstanding Tenth Circuit precedent explaining that awarding benefits is only appropriate where "the evidence clearly shows that the administrator's actions were arbitrary and capricious, or the case is so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground." *Caldwell*, 287 F.3d at 1289 (internal quotation marks and citation omitted); *see also Carlile*, 988 F.3d at 1229 ("[I]f the evidence in the record clearly shows that the claimant is entitled to benefits, an order awarding such benefits is appropriate.") (internal quotation marks and citation omitted); *Rekstad*, 451 F.3d at 1121 (remand is the proper remedy unless it "is so clear-cut that it was unreasonable" to deny benefits) (internal quotation marks and citation omitted).

Consistent with both the law of this Circuit and this Court's prior decisions, the Court should review the administrator's analyses and decisions on remand and uphold them based on the reviewers' thorough and record-based explanation of why residential treatment was not medically necessary.

### B.    United Correctly Denied Benefits Under Both the Arbitrary and Capricious and De Novo Standards of Review.

Dr. Fischer's and Dr. Cristobal's analyses on remand, denying benefits for lack of medical necessity, were well reasoned, based on a thorough review and discussion of Kate's medical record (with appropriate citations thereto), and therefore easily meet the arbitrary and capricious standard of review. *Adamson*, 455 F.3d at 1212 (the court "will . . . uph[o]ld [an administrator's decision] so long as it is predicated on a reason[able] basis") (citation omitted); *see also Kimber*, 196 F.3d at 1098 (requiring courts to affirm where the administrator's "decision falls somewhere on a continuum of reasonableness—even if on the low end") (internal quotation marks and citation omitted).

Based on a careful review of the record evidence, Dr. Fischer and Dr. Cristobal drafted well-reasoned analyses describing why 24-hour residential treatment services were not medically necessary and Kate could have been treated at a lower level of care. Both responded to Plaintiffs' counterarguments and explained why they disagreed with Kate's treating providers. United's benefits denial on remand was thus well reasoned and grounded in substantial evidence.

Indeed, even if the Court declines to apply arbitrary and capricious review and assesses the question de novo, United's benefits denial was correct based on the medical record. The record shows that after two long-term placements at BlueFire, Kate made significant progress and no longer required 24-hour monitoring and treatment, but rather could have been treated at a lower level of care, such as partial hospitalization or intensive outpatient treatment.

The Court should affirm United's benefits denial and enter judgment for Defendants.

### 1.    Dr. Fischer and Dr. Cristobal engaged in a meaningful dialogue with Plaintiffs and their providers' positions and reasonably concluded that Kate could have been treated at a lower level of care.

Dr. Fischer's and Dr. Cristobal's analyses on remand were well reasoned and supported by substantial evidence. After extensive review of the administrative record, Dr. Cristobal determined that Kate "could have continued her treatment at a lower level of care and did not require placement at a residential treatment center." Mot. Ex. A at 10. Dr. Fischer reached the same conclusion. Opp. Ex. 1 at 12. Dr. Fischer and Dr. Cristobal also provided significant detail when explaining and documenting their analyses, grappling directly with the portions of the record Plaintiffs argue United did not address in its prelitigation denials. *See* Mot. at 12-13 (¶¶ 57, 61-64). The remand reviewers cited extensively to Kate's medical records, addressed the arguments raised in Plaintiffs' appeal letters, and explained why they disagreed with Kate's providers' opinions. United's denial, which was based on Dr. Fischer's and Dr. Cristobal's thorough and thoughtful analyses cannot be characterized as "not grounded on any reasonable basis." *Kimber*, 196 F.3d at 1098 (internal quotation marks and citation omitted). The Court should affirm United's remand benefits denial.

### i.    Kate's residential treatment at Chrysalis was not medically necessary.

On remand, Dr. Cristobal and Dr. Fischer – two board-certified physicians – appropriately concluded that Kate's treatment at Chrysalis was not medically necessary as of April 18, 2016. Mot. Ex. A at 8 (Dr. Cristobal concluding that "Kate's treatment at Innerchange Chrysalis was not medically necessary"); Opp. Ex. 1 p. 7 (Dr. Fischer concluding that Kate "did not require residential treatment from April 18, 2016 forward"). Their conclusions aligned with every prior reviewer to consider Kate's claim and medical records,[2] and their analyses engaged more fully

---

[2] *See* AR 692 (Dr. Libus explaining Kate's "condition did not meet criteria for" residential treatment services and she "could be treated in a less intensive Level of Care"); AR 2668 (Dr. Libus, in a separate letter, noting that Kate "could be treated in a less intensive Level of Care");

with the record and directly addressed Kate's providers' contrary opinions. *See generally* Mot. Ex. A; Opp. Ex. 1. Dr. Cristobal and Dr. Fischer predicated their analyses and reached their conclusions based on a review of the Plan's terms, the relevant guidelines,[3] and Kate's medical records. Mot. Ex. A at 2-3 (listing materials Dr. Cristobal reviewed); Opp. Ex. 1 pp. 3-4 (listing materials Dr. Fischer reviewed).

Substantial evidence supported Dr. Fischer's and Dr. Cristobal's conclusions. Their respective remand analyses show that the record amply supported their decisions. Dr. Fischer observed that, when Kate was admitted to Chrysalis after long-term treatment at BlueFire, "her mood, level of worry and social anxiety did not appear to seriously impact her ability to understand and participate in treatment programming or require 24-hour supervision." Opp. Ex. 1 p. 11. Dr. Cristobal noted that "there were no safety or medical issues in the days leading up to and at the time of" Kate's second discharge from Blue[F]ire Wilderness. Mot. Ex. A at 8. For example, Dr. Cristobal explained that Kate's discharge prognosis from BlueFire on April 14, 2016, shortly before entering treatment at Chrysalis, was "good given that she continue (sic) to remain open to

---

AR 2661 (Dr. Solomon concluding Kate's medical record "does not indicate a need for . . . residential treatment center, level of care services"); AR 4484 (Dr. Soto writing that Kate "could be treated in a less intensive level of care"); AR 6420 (Dr. Odom similarly concluding Kate's "care and recovery could have taken place in the mental health outpatient setting"); AR 6428 (independent reviewer determining that residential treatment was not "medically necessary").

[3] In their affirmative motion for benefits, Plaintiffs argue that Dr. Cristobal's denial was procedurally flawed because, in reaching his decision, he applied not only the LOC Guidelines, but also The American Association of Community Psychiatrists CALOCUS-CASII Child and Adolescent Level of Care/Service Intensity Utilization System (CALOCUS-CASII) for Level 5, which is at third-party guideline that United currently uses for coverage decisions for adolescents in residential treatment. Mot. at 34-35. That Dr. Cristobal considered the most up-to-date guidelines *in addition to* United's guidelines in effect in 2016 gave Plaintiffs two potential paths to coverage, neither of which was successful. Mot. Ex. A at 3-4 (explaining that Dr. Cristobal's decision "would be the same regardless of the guidelines applied"). Regardless, even Plaintiffs would concede that if the services do not satisfy the criteria under the LOC Guidelines, benefits are unavailable. AR 689, AR 9869-70.

the treatment process[.]" *Id.* Based on her medical records from her first few months at Chrysalis, Dr. Fischer found that she was "generally calm and cooperative, motivated and engaged, responsive to staff, and doing reasonably well," "[s]he was eating, sleeping and independently doing her daily activities," and "[s]he had been making safe decisions and had not exhibited risky impulsiveness." Opp. Ex. 1 p. 11.

Dr. Cristobal observed that Kate's Chrysalis therapy notes were "uneventful and depict[ed] a member who was insightful ('Kate discussed insecurities'), receptive to feedback, and willing to engage productively in the treatment milieu as well as in the different therapies." Mot. Ex. A at 8. He also found that she did not "endorse suicidal ideation [or] homicidal ideation," and "[h]er self-care was appropriate." *Id.* at 8-10. Citing to evidence in the record including Plaintiffs' appeal letters, medical records, BlueFire discharge and therapy notes, and provider evaluations, he wrote that "her home environment was stable and her mood and behavior had improved." *Id.* at 7. Dr. Fischer similarly found that Kate's family relationships had stabilized, noting that there were "[n]o significant incidents" while she was with her family away from Chrysalis for extended periods, "as she remained willing to work with her parents, work on improving communication skills, low frustration tolerance, addressing family issues." Opp. Ex. 1 p. 12.

Under the Plan, residential treatment services are only medically necessary if a member cannot be "safely, efficiently, and effectively assessed and/or treated in a less intensive level of care." AR 689. Based on Kate's progress at BlueFire and her subsequent stability in mood and behavior while at Chrysalis, Dr. Fischer and Dr. Cristobal both concluded, consistent with the LOC Guidelines, that Kate could have been treated at a lower level of care. As both recognized, this does not mean that Kate did not have challenges or setbacks; for example, Dr. Cristobal recognized that Kate "at times endorsed passive suicidal ideation," but noted that she "never acted on" it. Mot.

21

Ex. A at 9. He also acknowledged that her family was concerned about her nutrition but noted that she never received eating disorder treatment. *Id.* And he noted that there were not "acute changes in [Kate's] signs and symptoms and/or psychosocial and environmental factors" that prevented her from being treated in outpatient care, intensive outpatient, or partial hospitalization. *Id.* at 8. Dr. Fischer similarly found no barriers to her treatment in a community setting, writing that Kate "had not been engaging in treatment rejecting behavior," her "medication regimen was still being adjusted to address symptoms, side effects, and could have been safely managed in the community," and, "[t]hough [she had] demonstrated occasional periods of regression, these behaviors were not unusual for prolonged residential stays." Opp. Ex. 1 p. 12.

Dr. Fischer explained that "the clinical research is clear that what matters most is the integration of all the necessary elements of treatment, not whether they are specifically delivered in a structured residential setting." *Id.* This is because the "continuum of mental health care should have been seen as a fluid treatment pathway, where she may enter treatment at any level and be moved to more or less-intensive settings or levels of care as her changing clinical needs dictate." *Id.* Here, the reviewers found that, as of April 18, 2016, Kate had stabilized and could have received a lower level of care. Mot. Ex. A at 8; Opp. Ex. 1 at 6. Several courts in this district have upheld similar decisions as not arbitrary and capricious. *See Amy G. v. United Healthcare*, No. 17-00427, 2018 WL 2303156, at *5 (D. Utah May 21, 2018) (upholding denial of benefits where reviewers denied coverage based on member's "progress" and because member "no longer needed the type of care and services provided in a 24[-]hour residential treatment center"); *Mark M. v. United Behav. Health*, No. 18-00018, 2020 WL 5259345, at *12 (D. Utah Sept. 3, 2020) (holding medical necessity determination was not arbitrary or capricious where reviewers determined member could have been treated at an outpatient level).

Dr. Cristobal acknowledged that the record shows Kate was still experiencing some symptoms of her depression and other diagnoses while admitted at Chrysalis. But he explained that "a person does not immediately require inpatient hospitalization for having thoughts of death, thoughts of hurting others, difficulty taking care of self, or even psychosis." Mot. Ex. A at 7-8. Rather, "many patients continue to experience these issues in varying levels while at home or in different levels of treatment." *Id.* Imperfect progress is expected when receiving treatment at any level. That is why courts facing similar records where patients have made significant progress with some remaining areas of concern have concluded that a denial of residential treatment benefits was not arbitrary and capricious. *See, e.g.*, *Tracy O. v. Anthem Blue Cross Life & Health Ins. Co*, 807 F. App'x 845, 855 (10th Cir. 2020) (rejecting argument that denial of residential treatment coverage was arbitrary and capricious where, during treatment, there was no "deterioration [of the member's behavior] beyond the 'usual status' of the 'consistently troubling' 'behaviors and symptoms'"). "[T]he point isn't whether [Kate] was a picture of health. Neither is it whether she was ready to stop treatment altogether. It is whether she had improved so little that she continued to need" the care provided at Chrysalis, "or instead could handle a step down in treatment." *Alexandra H. v. Oxford Health Ins., Inc.*, 763 F. App'x 865, 869 (11th Cir. 2019).

> ii.    **Dr. Fischer and Dr. Cristobal engaged with Kate's medical record and explained why they disagreed with her treating providers' opinions that residential treatment was appropriate.**

Dr. Fischer's and Dr. Cristobal's analyses on remand filled the explanatory gaps identified by this Court in United's prelitigation denial letters.

*First*, both physician reviewers explained in detail why they supported United's coverage denial, citing to the administrative record. Dr. Cristobal's 12-page letter includes a thorough discussion of why he concluded residential treatment was not medically necessary. Dr. Fischer

included a similarly lengthy explanation. *See supra* Arg. B.1.i. Both doctors also outlined the applicable LOC Guidelines, and then methodically applied them to Kate's medical records. Mot. Ex. A at 6-8; Opp. Ex. 1 pp. 6, 11-14.

Dr. Cristobal addressed arguments in Plaintiffs' remand appeal letter head on, including by responding to Plaintiffs' argument that Kate met the LOC Guideline criteria of posing no "imminent or current risk of harm to self" or others. Mot. Ex. A at 7. As Dr. Cristobal explained, though Kate may have met this criteria, she "did not meet several" others, including that she could not be treated at a lower level of care. *Id.* Dr. Fischer's and Dr. Cristobal's letters thus provided the "scientific or clinical judgment" ERISA requires for medical necessity determinations, based on an application of "the terms of the plan to the claimant's medical circumstances." 29 C.F.R. § 2560.503-1(g)(1)(v)(B); *see also E.W. v. Health Net Life Ins. Co.*, 86 F.4th 1265, 1302 (10th Cir. 2023) (rejecting argument that denial letters were conclusory where they "identified the" applicable criteria and "explained that" the claimant had not exhibited the necessary "symptoms or behaviors within the relevant period").

Dr. Fischer and Dr. Cristobal also extensively cited and quoted Kate's medical records. They listed the over two dozen records they relied on in conducting their reviews. Mot. Ex. A at 2; Opp. Ex. 1 pp. 3-4. These records included Plaintiffs' appeal letters, treatment progress and discharge notes from BlueFire, Kate's Chrysalis medical records, and Kate's providers' recommendations. Mot. Ex. A at 2; Opp. Ex. 1 pp. 3-4. Dr. Fischer's and Dr. Cristobal's letters showed that they scrutinized these records in reaching their opinions. Throughout his discussion, Dr. Cristobal repeatedly cited the specific record he reviewed and explained its significance to his decision. *See, e.g.,* Mot. Ex. A at 8 (quoting BlueFire discharge summary notes); *id.* (providing date of therapy notes relied on and discussing them); *id.* at 10 (referring to and discussing Kate's

BlueFire and Chrysalis medical records). Dr. Fischer did, too. Opp. Ex. 1 pp. 8 (engaging with Kate's providers' contrary opinions), 10 (discussing Kate's BlueFire records), 10-11 (analyzing Kate's Chrysalis records). Such engaged discussions of Plaintiffs' records show Plaintiffs received the "meaningful engagement" ERISA requires. *Isbell v. Unum Life Ins. Co. of Am.*, No. 23-1351, 2025 WL 40379, at *1 (10th Cir. Jan. 7, 2025) (ruling disability benefit denial letters satisfied ERISA where they informed claimant "of the evidence on which it relied").

*Second*, both doctor reviewers explained why they disagreed with Kate's treating providers' opinions that she required residential treatment. Kate submitted provider opinions from two clinicians: Dr. Jeremy Chiles and Dr. Wesley Dunn. United's reviewers engaged with these opinions, and concluded they did not establish that Kate required residential treatment as of April 18, 2016. Equally important, both doctor reviewers explained the basis for that conclusion.

At the outset, both Dr. Fischer and Dr. Cristobal recognized that Dr. Chiles' and Dr. Dunn's recommendations were "temporally irrelevant." Opp. Ex. 1 p. 9. Dr. Chiles' May 2015 evaluation preceded Kate's admission to Chrysalis on April 18, 2016 by nearly a year and was well before she completed her long-term stay at BlueFire. *Id.* Dr. Dunn's recommendations suffered the same flaw: his September 14, 2017 and December 9, 2018 recommendations spoke to Kate's "clinical history and acuity from 2015[.]" *Id.* at 10; Mot. Ex. A at 10. Neither Dr. Chiles nor Dr. Dunn assessed whether Kate required residential-treatment-level care as of April 18, 2016, which was the critical inquiry for Kate's appeal.

United's reviewers also each specifically addressed the reasons that Dr. Chiles and Dr. Dunn recommended residential treatment:

**Dr. Chiles.** Dr. Fischer observed that Dr. Chiles recommended residential treatment or a "residential boarding school environment," which he explained "is not the same service intensity

or clinically comparable to MH RTC." Opp. Ex. 1 p. 10. That Dr. Chiles envisioned that Kate could be treated at a lower level of care was consistent with Dr. Chiles' recommendation that, no matter the facility, Kate should receive "typical *outpatient* individual, group, and family therapy services." *Id.* at 8 (emphasis added). Dr. Cristobal analyzed Dr. Chiles' recommendation similarly, explaining that Dr. Chiles' recommended therapies "can also be found in outpatient settings as well as levels of care that are higher than outpatient care but of lower intensity than inpatient or residential treatment settings." Mot. Ex. A at 9.

Further analyzing Dr. Chiles's residential treatment recommendation, Dr. Cristobal pointed out that Dr. Chiles' own assessment of Kate was that, at BlueFire, she had "begun to show more personality," "was dressed and groomed adequately," her "self-care was appropriate," and she "was not rude, belligerent or hostile at any point." Mot. Ex. A at 9. Even more, Dr. Cristobal noted that despite Kate's "family's concern about disordered eating behaviors," Dr. Chiles' assessment suggested that these challenges "did not require therapy or treatment specific to eating disorder[s]." *Id.*

**Dr. Dunn.** Dr. Cristobal noted that Dr. Dunn recommended that Kate required residential treatment due to Kate's "anxiety, depression, and nutrition dating back to 2015," Mot. Ex. A at 10. But he also observed that, when Dr. Dunn was contemporaneously treating Kate into late November 2015, her family sought only outpatient care and did not consider inpatient hospitalization, partial hospitalization, or intensive outpatient programs. *Id.* Dr. Fischer came to the same conclusion, noting that, although Dr. Dunn retroactively recommended residential treatment based on his treatment of Kate in 2015, the record shows no efforts to seek such treatment at the time, with the family instead opting for lower intensity services at the BlueFire outdoor program. Opp. Ex. 1 p. 10.

Dr. Cristobal also disagreed with Dr. Dunn's recommendations because, immediately after leaving BlueFire for the second time, Kate's "mood, anxiety levels, and social functioning had already shown significant improvement." Mot. Ex. A at 10. He also observed that, at discharge, she was "no longer underweight," and "actively participated in therapy, equine activities, and medication management while also completing school coursework." *Id.* Consistent with his other analysis, Dr. Cristobal thus determined that Kate's immediate admission to Chrysalis could have been reconsidered "in favor of a less intensive treatment setting." *Id.* Dr. Fischer similarly determined that Kate's progress following BlueFire did not warrant immediate admission to Chrysalis, observing that: "she was generally described as happy, cooperative, in a good mood," "[s]he had been responding to . . . setbacks by using coping skills," "[s]he had not been requiring more frequent intensive staff interventions to co-regulate and/or contain emotional dysregulation." Opp. Ex. 1 p. 12. She was also at a safe weight at time of admission and never diagnosed with an eating disorder. *Id.* at 8. Dr. Dunn's statements in Kate's mother's FMLA paperwork did not change Dr. Fischer's opinion. *Id.* at 9. As indicated in Dr. Fischer's opinion, Dr. Dunn's statements in the FMLA paperwork were retroactive. *Id.* Notably, this FMLA paperwork is a standard form sheet, requiring providers like Dr. Dunn to check off boxes regarding the circumstances of family leave; it was not a provider opinion that Kate required residential treatment.

Such reasoned consideration of contrary provider opinions satisfies ERISA. *See, e.g.,* *Isbell*, 2025 WL 40379, at *10 (ruling administrator had meaningfully engaged with contrary provider opinions in disability benefits case because its physician reviewer had "set out reasons, supported by substantial evidence in the record, for his disagreement with those opinions"). Having considered and rejected Dr. Chiles' and Dr. Dunn's opinions, ERISA required no more from Dr. Fischer or Dr. Cristobal. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)

(explaining that ERISA does not require an administrator "to accord special weight to the opinions of a claimant's physician").

The Court should defer to United's reasoned judgment and meaningful engagement with the record on remand to affirm its denial of residential treatment benefits and enter judgment in favor of Defendants.

> ### 2. Even if the court undertook de novo review, the record shows that United rightly denied coverage.

Even if the Court declined to defer to the Administrator and reviewed United's remand decision de novo, it should hold that the coverage denial was correct because the record shows that residential treatment was not medically necessary. While there is evidence in the record regarding Kate's repeated struggles with depression, anxiety, and perceived food avoidance, it also shows that she was not so afflicted by these challenges that she required treatment in a 24-hour facility. Her psychosocial assessment at admission to Chrysalis identified her "[p]resenting [p]roblems" and "[r]eason for [r]eferral" as "[d]epression, body image, parent-child relational, sibling relational." AR 720. Her assessment contains repeat references to her struggles with her relationship with her twin sister and mother related to her sister's own mental health struggles. AR 715-16. And her parents' expectations for treatment were for their daughter to "accept her body and remove her 'hoodie'" and "identify and communicate her needs." AR 721. None of these challenges rise to the level of "[p]sychosocial and environmental problems that are likely to threaten the member's safety or undermine engagement in a less intensive level of care." AR 7682. Indeed, Kate's eating habits never led to an eating disorder diagnosis or related treatment.

After a month-long admission at BlueFire where Kate showed consistent progress, there is no evidence in the record that admission directly into Chrysalis, a 24/7 residential care facility, was necessary or the appropriate level of care for Kate going forward. Under the Plan, "Medically

Necessary" services include "those services or supplies provided by a hospital, physician, or other provider, which are[] . . . appropriate for the treatment of the diagnosed symptoms, condition, disease, illness, or injury" and "the most appropriate supply or level of service which can safely be provided to the covered individual." AR 9869-70. Residential treatment was only medically necessary where the factors "leading to admission cannot be safely, efficiently, or effectively assessed and/or treated in a less intensive setting due to acute changes in the member's signs and symptoms and/or psychosocial and environmental factors." AR 689.

Kate's record reveals no barriers to her stepping down to a lower level of care, such as partial hospitalization or outpatient care. Her therapy notes show Chrysalis described that she was "very engaged," AR 2475; "Happy, Bright, and Pleasant," AR 2473, AR 2372 (describing her as "bright and engaged"); "did not seem depressed," AR 2403, AR 2461-62, AR 2454-55, AR 2448 ("showing no evident signs of depression"); "seem[ed] to be dealing with her body image issues" and ate "well during meal times," AR 2397, AR 2390 ("seemed to eat a normal portion"), AR 2380 ("ate and snacked throughout the day when appropriate"). Kate also successfully went home on multiple occasions, seemingly without issue, as well as on an international trip. AR 6495; AR 1113 ("Kate seemed in great spirits and happy to be going on a visit"). And the reason Chrysalis's providers consistently recommended continuing placement at Chrysalis was so that Kate could receive "individual, group, and family therapy," all of which is available at lower levels of care. AR 2436, AR 2374, AR 2742, AR 2470, AR 2458. Kate's contrary provider opinions from Dr. Chiles and Dr. Dunn do not compel a different conclusion; neither doctor opined that Kate required residential treatment care as of April 18, 2016. *See supra* Arg. B.1.ii.

Kate may very well have required further care. But the record does not show that residential treatment care, an extreme intervention that isolates a child from their family for months or years,

was the only option. On de novo review, courts faced with similar records have affirmed a denial of benefits. *Anne M. v. United Behav. Health*, No. 18- 808, 2022 WL 3576275, at *8 (D. Utah Aug. 19, 2022) (ruling that denial of benefits for residential treatment services was appropriate where claimant did not require "acute stabilization"); *Richard K. v. United Behav. Health*, No. 18 CIV.6318, 2025 WL 869715, at *19 (S.D.N.Y. Mar. 20, 2025) (affirming denial of benefits on de novo review even where claimant was not "a picture of health" because question was "whether she had improved so little that she continued to need the same kind of care as she had received for [twenty-six days at Sedona] or instead could handle a step down in treatment"). Thus, United's denial of benefits on remand should be affirmed under either an arbitrary and capricious or de novo standard of review.

## V.   CONCLUSION

For the foregoing reasons as well as those set forth in their Opposition to Plaintiffs' Motion, Defendants respectfully request that this Court enter judgment in Defendants' favor on all counts in Plaintiffs' Complaint and affirm United's denial determination on remand.

DATED this 18th day of July, 2025.                     Respectfully submitted,


                                                                        */s/ Amy M. Pauli*
                                                                        Amanda Shafer Berman
                                                                        Amy M. Pauli
                                                                        CROWELL & MORING LLP

                                                                        Michael H. Bernstein
                                                                        ROBINSON & COLE LLC

                                                                        *Defendants UnitedHealthcare*
                                                                        *Insurance Company, United*
                                                                        *Behavioral Health, and Apple, Inc.*
                                                                        *Health and Welfare Benefit Plan*