IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ANNE A. and KATHLEEN A., <br><br>    Plaintiffs, <br><br> v. <br><br> UNITED HEALTHCARE INSURANCE COMPANY, UNITED BEHAVIORAL HEALTH, and the APPLE INC. SMALL BUSINESS HEALTH OPTIONS PROGRAM, <br><br>    Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING IN PART AND GRANTING IN PART PLAINTIFFS' MOTION FOR BENEFITS** <br><br><br> Case No. 2:20-cv-00814-JNP <br><br> Chief District Judge Jill N. Parrish |

This action arises under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et seq.* Plaintiffs seek recovery of benefits under 29 U.S.C. § 1132(a)(1)(B) (the "ERISA Claim").[1] ECF No. 83. In March of 2024, the Court remanded the action to Defendants after finding that Defendants' claim denials were arbitrary and capricious. ECF No. 80. On remand, Defendants upheld the denial of benefits.

Presently before the court are Plaintiffs' motion to re-open the case and the parties' cross-motions for summary judgment. ECF Nos. 82, 83, 94. Having considered the parties' arguments

---

[1] In the pre-remand proceedings, Plaintiff also alleged a violation of the Mental Health Parity and Addiction Equity Act under 29 U.S.C. § 1132(a)(3). The court opted to not address that claim in its March 2024 Order on account of it being premature. Plaintiffs do not again raise the claim. *See* ECF No. 105 at 2 n.1 ("After going through the post-litigation remand process, Plaintiffs do not ask the Court to revisit their claim that United violated the Mental Health Parity and Addition Equity Act . . . .").

and the record, Plaintiffs' motion to re-open the case is granted, Plaintiffs' motion for summary judgment (entitled a "Renewed Motion for Benefits, Attorneys' Fees, Prejudgment Interest, and Costs") is denied in part and granted in part, and Defendants' motion for summary judgment is granted.

**FACTUAL AND PROCEDURAL BACKGROUND**

## I.      Pre-Remand Factual Background

The court recites, in a slightly abridged form, the facts as stated in its March 2024 Order. *See Anne A. v. United Healthcare Ins. Co.*, No. 220CV00814JNPDAO, 2024 WL 1307168 (D. Utah Mar. 26, 2024). Defendants United Healthcare Insurance Company ("United"), United Behavioral Health ("UBH"), and The Apple, Inc. Health and Welfare Benefit Plan, sued herein as the Apple, Inc. Small Business Health Options Program ("the Plan") (collectively, "Defendants") denied benefits allegedly due to Plaintiffs under the Plan, which is an ERISA-governed employee group health benefit plan. ECF No. 54-2 at 77. At all relevant times, Anne was a Plan participant, Anne's daughter Kate was a Plan beneficiary, United was the claims administrator, and UBH was the Plan's designated mental health claim administrator. ECF No. 55 at 1–2.

Plaintiffs obtained care for Kate's mental health at BlueFire Wilderness Program ("BlueFire") and later at Chrysalis, a residential treatment center ("RTC"). ECF No. 56 ¶¶ 24, 31, 41. Plaintiffs sought Plan coverage for Kate's treatment at Chrysalis between April 18, 2016 and December 18, 2017. *Id.* ¶¶ 31, 34. Defendants denied coverage. ECF No. 54-3 at 218–19; ECF No. 54-12 at 306–07. Plaintiffs claim Defendants' wrongful denial of coverage caused them to incur $250,000 in unreimbursed medical expenses. ECF No. 2 ¶ 53.

### A.      The Plan

The Plan offers benefits for medically necessary mental health care, including at RTCs.

2

ECF No. 55 at 5. The Plan only covers services that meet the definition of covered health expenses within Defendants' clinical guidelines for the appropriate level of care. ECF No. 54-1 at 55; ECF No. 54-2 at 165. The Plan gives UBH discretion to make medical necessity determinations and "[t]he fact that a physician or other provider prescribes or orders the service does not, of itself, make such services Medically Necessary." ECF No. 70 at 10; ECF No. 54-2 at 64. UBH used its Optum Level of Care Guidelines, which set out criteria for determining RTC coverage, to review Plaintiffs' benefits claims. ECF No. 54-3 at 215–17. UBH's Guidelines define RTC services as a "sub-acute facility-based program which delivers 24-hour/7-day assessment and diagnostic services, and active behavioral health treatment to members who do not require the intensity of nursing care, medical monitoring and physician availability offered in Inpatient." *Id.* at 215. For RTC care to be medically necessary under the UBH Guidelines, the member must require 24-hour/seven days per week treatment for symptoms that interfere with the safety of the insured or others or that would "undermine engagement in a less intensive level of care without the intensity of services offered in" RTC care. ECF No. 54-3 at 215–16.

### B. Kate's Condition and Treatment

Kate's troubles with depression began in sixth grade, when she attempted to run away, beginning a pattern of self-isolation that led her to stop attending school. ECF No. 54-6 at 399–400. While Kate denied contemplating self-harm, she made repeated statements that indicated suicidal ideation online and to her parents. *Id.* at 401 ("Kate made statements to the effect of 'You would be better without me,' 'You are making me want to kill myself,' 'No one cares about me,' 'No one would miss me if I were gone,' and 'I don't care if all my bones break.'"); *see also id.* at 399.

In early 2015, Kate met with Dr. Wesley Dunn, a psychiatrist who specializes in treating

children and adolescents. *Id.* at 403. Their meetings continued for a month, but Kate "said nothing to him" and refused his prescription of an anti-depressant medication. *Id.* On Dr. Dunn's recommendation, Kate's parents took her to an eating disorder specialist, Dr. Carlton. *Id.* at 404. While her meeting with Dr. Carlton was "terrible[,]" Kate was not diagnosed with an eating disorder and the family ultimately learned that Kate had not been engaging in self-harm. *Id.*

Near the end of seventh grade, Kate was admitted at BlueFire, an outdoor behavioral health program that offered treatment for children with mental health challenges. *Id.* at 399. Shortly thereafter, a BlueFire therapist recommended a psychological evaluation, which Dr. Jeremy A. Chiles conducted in May of 2015. *See id.* at 398–415. Dr. Chiles diagnosed Kate with "Persistent Depressive Disorder, moderate to severe" and "Generalized Anxiety Disorder, moderate." *Id.* at 413. Based on the evaluation, Dr. Chiles recommended that Kate be "placed in all all-girls residential treatment center" following her time at BlueFire. *Id.* Such treatment would "provide Kate with ongoing support, structure, and nurturance to work on and lessen the impact of anxiety and depression, find a direction to pursue in the future, improve relationships with family members, and develop social skills." *Id.* at 413–14.

Kate did not obtain RTC care immediately upon leaving BlueFire. *Id.* at 561. However, her parents "spent weeks calling, applying, and working with United to find a facility that might be available for Kate if needed." *Id.* Kate saw different therapists but ultimately decided she would only speak with Dr. Dunn, whom she had been seeing periodically since early 2015. *Id.*

Kate's situation worsened around her eighth-grade Christmas break. At that time, she "begged [her parent, D.] to send her away to live somewhere else, that her life has no hope, that she is useless, and that no one should care about her." *Id.* at 562. When Kate's parents realized "nothing was helping" her, Kate's mother Anne took months off work to try to find doctors or

RTCs that might be able to help. *Id.* at 563. On January 19, 2016, Dr. Dunn completed a form supporting Anne's application for family medical leave from work, writing that "Kate should not be left alone for extended periods of time due to depression and suicidal thoughts" and "needs to be under near constant observation given high suicidal risk and impulsive behavior." *Id.* at 530–532. Molly Baron, a therapeutic placement consultant, recommended that Kate return to BlueFire for a month, which she did. *Id.* at 563. Kate's parents spent that month working with Ms. Baron to find an RTC that would serve Kate's needs, and they settled on Chrysalis. *Id.*

Kate was admitted at Chrysalis on April 18, 2016, and received a psychosocial assessment the following day from a therapist, Dr. Becca Wineka. ECF No. 54-4 at 17–19. The next month, Kate met with Dr. Houser, a psychiatrist, who wrote of his suspicion that Kate remained "quite anxious" and that she might benefit from an OCD workbook to discuss in therapy. *Id.* at 32. Kate ultimately received treatment at Chrysalis until December 18, 2017. ECF No. 54-6 at 564; ECF No. 54-11 at 190–91. In September of 2017, Kate's long-time psychiatrist, Dr. Dunn, reiterated his opinion from early 2016, writing that he was "not . . . comfortable treating [Kate] on an outpatient basis. Kate's degree of depression requires residential treatment." ECF No. 54-6 at 417. Dr. Dunn expressed "full support" of Kate's treatment at Chrysalis based on his time as her psychiatrist. *Id.* Dr. Dunn later restated this position in a letter dated December 9, 2018. ECF No. 54-11 at 143–44.

### C.    Denial of Benefits and Prelitigation Appeals

Plaintiffs first sought coverage for Kate's RTC care at Chrysalis in December 2016. ECF No. 54-11 at 229–30; *see also* ECF No. 54-3 at 224–25. On November 22, 2017, Defendants issued their first denial letters, drafted by Dr. Libus, a reviewing physician. ECF No. 54-3 at 218–19 (denial letter for coverage between April 18, 2016 and March 31, 2017); ECF No. 54-12 at 306–

07 (denial letter for coverage between May 1, 2017 and December 18, 2017).[2] The letters stated that UBH reviewed the services provided by Chrysalis and found them not medically necessary because Kate's condition "did not meet criteria" for RTC treatment and "could be treated in a less intensive Level of Care."[3] *Id.* The second letter reached the same conclusion on a similar basis. *See* ECF No. 54-12 at 306. The letters both asserted that the decisions were reached by application of the "Optum Level of Care Guidelines for the Mental Health Residential level of care" after "review of your child's medical record."[4] ECF No. 54-3 at 218–19; ECF No. 54-12 at 307.

On May 18, 2018, Plaintiffs submitted a first appeal of Defendants' denial of claims. ECF No. 54-4 at 235. This 40-page appeal letter was also accompanied by roughly 1,700 pages of exhibits, mostly made up of Kate's medical records from her time at Chrysalis. The attached exhibits also included Kate's Chrysalis admission application (ECF No. 54-6 at 370–96); Dr. Chiles' psychological evaluation and assessment of Kate (*id.* at 397–415); Dr. Dunn's September

---

[2] As detailed in its March 2024 Order, the court concluded the relevant period of Plan coverage contested by the parties is from April 18, 2016 until March 31, 2017 and from May 1, 2017 until December 18, 2017.

[3] In its March 2024 Order, the court focused only on the issue of medical necessity because Defendants appeared to have abandoned the other justifications for denying benefits raised in their denial letters. *See* ECF No. 80 at 6 n.4.

[4] The first denial letter justified its decision with the following conclusions:

> * Your child was not feeling like harming himself or others.
> * Your child was not hearing or seeing things that others don't.
> * Your child was able to look after her day to day needs.
> * Your child did not have severe medical problems that would require this level of care.
> She was willing and able to participate in her treatment. She had supportive family.
> . . . [Y]our child could continue care in the Mental Health Outpatient setting with medication management, individual and family therapy.

ECF No. 54-3 at 218–19.

14, 2017 letter of medical necessity, expressing his opinion that Kate needed residential treatment and could not be treated only on an outpatient basis (ECF No. 54-6 at 417); and Dr. Dunn's form completed on January 19, 2016 for Anne's family medical leave application (ECF No. 54-6 at 530–32). Plaintiffs' first appeal urged Defendants to support their response to the appeal with "specific evidence from the supplied documentation" to satisfy the requirement that Defendants "[p]rovide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim[.]" ECF No. 54-4 at 426. Plaintiffs argued in the appeal that Defendants' findings communicated in their denial letters failed to take Kate's medical history into account, and that if Defendants had considered them, they would not have denied coverage. *Id.* at 273–74.

On June 20, 2018, Defendants responded to Plaintiffs' first appeal with a letter by a new reviewing physician, Dr. Randall L. Solomon, who upheld the initial denial of benefits for April 18, 2016 through March 31, 2017. ECF No. 54-6 at 572–77. Dr. Solomon reiterated the prior reviewer's position, but provided new reasons for denying benefits as well, including his conclusion that Chrysalis was a "therapeutic boarding school" that didn't provide RTC care. *Id.* at 573. On September 12, 2018, Defendants sent Plaintiffs an additional letter by another reviewing physician, Dr. Michael Soto, upholding the denial of benefits for June 1, 2017 through December 18, 2017. ECF No. 54-8 at 678–83. Dr. Soto repeated the prior reviewers' conclusions that Kate's "condition did not meet criteria for this level of care" and she "could be treated in a less intensive level of care[.]" *Id.* Dr. Soto's letter then repeated the conclusions stated in Dr. Libus's original denial letters. *See id.* at 573.

Plaintiffs submitted a second appeal on August 13, 2018. ECF No. 54-6 at 555–65. Plaintiffs reiterated their position on the medical necessity of Kate's RTC care and requested that

Defendants explain the basis of their disagreement with the opinions of Kate's medical care providers in their response. *Id.* at 564. Defendants sent a second letter to Plaintiffs on September 12, 2018 that also relied on Dr. Soto's medical necessity opinion outlined in the preceding letter to uphold the initial denial of benefits for dates April 18, 2016 through March 31, 2017 for a second time, responding to Plaintiffs' second appeal. ECF No. 54-12 at 315–25. This letter communicated that Plaintiffs had exhausted their internal appeals for this period. *Id.* Completing their response to Plaintiffs' second appeal, Defendants sent a June 13, 2019 letter upholding the claims denial for dates June 1, 2017 through December 18, 2017 based on the opinion of another reviewing physician, Dr. Joan Odom.[5] ECF No. 54-11 at 161–68. This letter communicated that Plaintiffs had exhausted their internal appeals for this period as well. *Id.* at 163.

On January 3, 2019, Plaintiffs requested an independent external review of Defendants' denials of Plaintiffs' internal appeals. ECF No. 54-8 at 694–711. Plaintiffs requested that the reviewing party "carefully consider all of the information which we have taken the time to provide for your review." *Id.* at 697. On June 17, 2019, Plaintiffs received a letter from a case review

---

[5] Dr. Odom's decision rested on the following conclusions:

> [You were] admitted for the treatment of depression and anxiety.

> After reviewing the case notes, it is noted [your] condition did not meet guidelines for coverage of treatment in this setting. [You] had stable mental and physical health. [You] did not want to harm [yourself] or others. [Your] behavior was safe. [You] did not need around-the-clock monitoring and care in order to make progress with treatment.

> [Your] care and recovery could have taken place in the mental health outpatient setting.

ECF No. 54-11 at 162.

coordinator, licensed in psychiatry and employed by the Medical Review Institute of America, LLC, upholding the denial of benefits in Defendants' internal appeals.[6] ECF No. 54-11 at 169–176. After exhausting the available prelitigation appeal opportunities, Plaintiffs filed this ERISA action on November 19, 2020. ECF No. 2.

## II.    The Court's Remand Order

In its March 2024 Order, the court found that Defendants arbitrarily and capriciously denied plan benefits for Kate's treatment at Chrysalis. ECF No. 80. Specifically, the court found that Defendants failed to engage in the meaningful dialogue required by ERISA's claim procedures when responding to Plaintiffs' medical records and treating physicians' opinions throughout the prelitigation appeals process. *Id.* at 12. The court also found Defendants' failure to sufficiently

---

[6] The external reviewer reached this decision based on the following conclusions:

> As of 4/18/16, the patient was noted to be depressed. The patient was not actively suicidal, homicidal, psychotic, self injurious, aggressive or acutely manic. There was no indication the patient was at a dangerously low body weight. There was no indication of abnormal vital signs or laboratory results at the time of admission. The patient had no previous hospitalizations or treatment other than outpatient level of care and wilderness therapy. There was no indication for around the clock monitoring. Treatment could have been addressed at a lower level of care.

> Based on the above, the patient did not meet the Optum Level of Care Guidelines: Mental Health Conditions criteria for coverage of mental health residential treatment services from 4/18/16-3/31/17. There are no clinical circumstances unique to this particular patient that would make it medically necessary based on current medical literature.

> The appeal letter from the patient's parents, as well as the facility and outpatient provider, outline the history of mood and anxiety issues, as well as outpatient treatment and wilderness therapy.

> Based on the above, the prior determination is upheld.

ECF No. 54-11 at 173.

9

explain their denials of benefits to be a second basis for concluding those denials were arbitrary and capricious. *Id.* at 15.

Finding remand to be appropriate, the court outlined certain safeguards to govern the process. *Id.* at 18. Specifically, Defendants were obligated to conduct their review on remand based only on rationales that were both raised in the administrative record and communicated to Plaintiffs prior to the initiation of this litigation. *Id.*; *see David P. v. United Healthcare Ins. Co.*, 77 F.4th 1293, 1315–16 (10th Cir. 2023) (citing *Carlile v. Reliance Standard Life Ins. Co.*, 988 F.3d 1217, 1229 (10th Cir. 2021)) ("[R]emand . . . does not 'provide the plan administrator the opportunity to reevaluate a claim based on a rationale not raised in the administrative record . . . and not previously conveyed to Plaintiffs.'"). On remand, Defendants therefore could not rely on any of the post-hoc reasons for denying benefits that they raised for the first time before this court. ECF No. 80 at 18. They were obligated to limit their review only to the rationales for denying benefits that they stated in their denial letters—those relating to medical necessity. *Id.* at 19.

In ruling that Defendants were limited to their prelitigation "rationales" on remand, the court further counseled that "rationales" in this context referred to the specific pieces of evidence cited in Defendants' denial letters upon which they denied Plaintiffs' benefits claims. *Id.* at 18. Thus, Defendants could only justify a denial of benefits using the reasons and citations to Kate's medical records that were included in the prelitigation denial letters—and the denial letters contained no such citations. *Id.* at 19. The court acknowledged that this instruction may turn the remand process into an exercise in futility but reasoned that this was the cost of Defendants' failure to meet their obligation to support their decision denying benefits with reasoning and citations to the record. *Id.* at 19, 19 n.12.

### III.   Post-Remand Redetermination

On remand, two additional doctors reviewed the record and found that Kate did not require residential-treatment-level care. ECF No. 93 at 9. On June 5, 2024, Plaintiffs submitted a first level appeal letter to Defendants. ECF No. 93 ¶ 28. On August 21, 2024, Dr. Kenneth J. Fischer issued a denial letter.[7]

On November 7, 2024, Plaintiffs submitted a second level appeal letter. ECF No. 93 ¶ 37. Defendants' final post-remand denial letter, dated February 20, 2025, outlined the opinion of Dr. Ronald S. Cristobal that the residential treatment was not medically necessary for Kate from April 18, 2016, onward. ECF No. 83-1. Dr. Cristobal stated that he had reviewed the previous benefits determinations, the Optum Case notes, and the materials submitted by Plaintiffs. *Id.* at 3. He then stated that he applied two different sets of evaluation criteria to Kate's condition: (1) the American Association of Community Psychiatrists CALOCUS-CASII Child and Adolescent Level of Care/Service Intensity Utilization System for Level 5 (the "CALOCUS-CASII Guidelines"), and (2) the Optum Level of Care Guidelines: Residential Treatment Center (the "Optum LOC RTC Guidelines"). *Id.* at 3. Dr. Cristobal stated that the CALOCUS-CASII Guidelines are considered "standard" by insurance companies determining level of care, whereas the Optum LOC RTC Guidelines were the guidelines used in the pre-remand proceedings.[8] *Id.* at 3–4. Dr. Cristobal stated

---

[7] Dr. Fischer's rationales are largely repeated in the final post-remand denial letter by Dr. Cristobal, which the court describes in detail. *See* ECF No. 93-1 at 7 (Dr. Fischer's letter) ("Taking into consideration the available information, it is my determination that the member did not require residential treatment from April 18, 2016 forward. Specifically, at the time the member was admitted to Innerchange Chrysalis, the member's signs and symptoms and psychosocial factors had acutely improved as noted following successful completion [of] a month of BlueFire Wilderness Therapy.").

[8] Defendants state that United retired the Optum Guidelines on January 31, 2020. ECF No. 93 at 17.

that "[f]or the sake of simplicity, [he would] focus mostly on the Optum Criteria and how they apply to this case" and that "[his] analysis provided in the 'Rationale' section would be the same regardless of the guidelines applied." *Id.* at 4. Dr. Cristobal's letter subsequently laid out the "CALOCUS Evaluation Report" criteria as well as the "Optum Level of Care Guidelines: Residential Treatment Center" criteria. *Id.* at 4–7.

Dr. Cristobal's letter next contained a four-page "Rationale." *Id.* at 7–10. According to Dr. Cristobal, Kate's treatment at Chrysalis was not medically necessary because Dr. Cristobal (1) did not believe the intensity of services was required and (2) did not believe that her condition could not be safely, efficiently, and effectively assessed and/or treated in a less intensive level of care. *Id.* at 8.

Dr. Cristobal outlined several reasons why the intense services provided by Chrysalis were not medically necessary, including his view that the record shows that Kate was "insightful . . ., receptive to feedback, and willing to engage productively in the treatment milieu as well as in the different therapies." *Id.* Given the family's support, her progress while at BlueFire, and the Optum Guidelines, Dr. Cristobal wrote that it did not appear that a less intensive level of care would have been detrimental to her treatment. *Id.* at 9. Specifically, Dr. Cristobal noted:

- "[A]t the time the member was admitted to Innerchange Chrysalis, the member's signs and symptoms and psychosocial factors had improved following successfully completing a month at BlueFire Wilderness Therapy." *Id.* at 7; *see id.* at 10.
- "At the time of the member's discharge, her home environment was stable and her mood and behavior had improved to the point that it appeared that her care could have been managed at a lower level of care." *Id.* at 7; *see id.* at 10.

The letter also directly responded to Plaintiffs' argument that the pre-remand denial letters incorrectly relied on the rationale that Kate was "not in imminent danger of harm to self or others" to justify the treatment as not medically necessary. *Id.* at 7. Plaintiffs correctly pointed out that the

12

patient not being in imminent danger of harm to self or others is what the Optum LOC RTC Guidelines required for residential level of care to be considered appropriate. *Id.* The letter responds by acknowledging that while Kate did meet several admission criteria pertaining to the Optum LOC RTC Guidelines, she did not meet several others. *Id.*

Finally, Dr. Cristobal directly engaged with both Dr. Chiles's and Dr. Dunn's conclusions that the treatment was medically necessary. With respect to Dr. Chiles's recommendation that Kate enter a residential treatment center, Dr. Cristobal found that Dr. Chiles's clinical findings did not support the recommendation. *Id.* at 9. According to Dr. Cristobal, the therapies Dr. Chiles highlighted were available at less intense levels of care, the acuity of the issues Kate had never required psychiatric hospitalization or placement at lower levels of care, Kate only endorsed passive suicidal ideation at times but never acted upon such thoughts, and Kate's dietary issues and physical health did not require therapy or treatment specific to an eating disorder. *Id.* at 9–10. With respect to Dr. Dunn, Kate's outpatient child psychiatrist, Dr. Cristobal emphasized that Dr. Dunn's recommendation was retrospective rather than contemporaneous, speaking to Kate's condition in 2015 rather than in 2016 when Kate was admitted to Chrysalis. *Id.* at 10; *see also* ECF No. 93-1 at 10 (Dr. Fischer describing Dr. Dunn's prior recommendations as "temporally irrelevant").

## IV.    Current Proceedings

On April 23, 2025, Plaintiffs moved for the case to be re-opened "for purposes of granting the contemporaneously filed motion for summary judgment." ECF No. 82 at 1. The concurrently filed motion was entitled a "Renewed Motion for Benefits, Attorneys' Fees, Prejudgment Interest, and Costs." ECF No. 83. Plaintiffs argue that Defendants' post-remand conduct violated the guardrails the court set out in its prior order and that, consequently, the court should award

Plaintiffs full benefits for the treatment and the other associated fees, interest, and costs. ECF No. 83 at 36.

On July 18, 2025, Defendants filed a motion entitled "Cross Motion for Summary Judgment."[9] ECF No. 94. Defendants argue that their post-remand decision was not arbitrary and capricious, that the court should grant summary judgment in their favor, and that the court should dismiss Plaintiffs' claims for an award.[10] ECF No. 94 at 7–8.

## DISCUSSION

### I.   Motion to Re-Open

"Generally, when an ERISA case is remanded to the plan administrator for further proceedings, the decision on remand is reviewable by the District Court upon motion by either

---

[9] In their response to Plaintiffs' motion, Defendants outline numerous objections to the Plaintiffs' statement of relevant facts. ECF No. 93 at 11. Plaintiffs argue these are formulaic, boilerplate objections and that the court should consider these objections waived. ECF No. 105 at 3. The court agrees Defendants' objections, which sometimes address up to twenty fact statements at once, fail to establish any real factual dispute. Rather, they repeatedly argue that the listed facts "selectively cite" the record or "mischaracterize or argumentatively summarize" the court's prior order or the prior denial letters, without providing any specific examples or explanations. ECF No. 93 at 11–13; *see G.W.-S. v. United Healthcare Ins.*, No. 2:19-CV-810-RJS-DAO, 2024 WL 3652029, at *3 (D. Utah Aug. 5, 2024). However, the court also notes that in ERISA actions, "the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Clark v. Prudential Ins. Co. of Am.*, No. CIV-09-901-D, 2010 WL 3909335, at *6 n.7 (W.D. Okla. Sept. 29, 2010) (quoting *Farhat v. Hartford Life & Accident Ins. Co.*, 439 F. Supp. 2d 957, 966 (N.D. Cal. 2006)). "[S]ummary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record . . . ." *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010).

[10] On November 28, 2025, Plaintiffs moved for leave to file a surreply, arguing "Defendants inappropriately opted to use their reply" in support of their cross motion for summary judgment to address arguments Plaintiffs raised in Plaintiffs' reply to Plaintiffs' motion. ECF No. 109 at 2. Defendants have not opposed the motion. The court accordingly GRANTS the motion. ECF No. 109.

party." *Graham O. v. United Behav. Health*, No. 1:18-CV-31-TS, 2024 WL 170739, at *1 (D. Utah Jan. 16, 2024).

Because post-remand decisions are reviewable upon motion by either party and because defendants do not oppose the motion, the court finds it appropriate to re-open this case to evaluate Defendants' most recent denial. Plaintiffs' motion to re-open the case is GRANTED. Further, because the parties have already filed and fully briefed cross-motions for summary judgment, the court will proceed to consider those motions, as is customary in ERISA cases. *See id.*

## II.      Cross-Motions for Summary Judgment

As a preliminary matter, the parties dispute whether cross-motions for summary judgment have indeed been filed. *See, e.g.*, ECF No. 104 at 3. To start, Plaintiffs filed a "Renewed Motion for Benefits, Attorneys Fees, Prejudgment Interest, and Costs." ECF No. 83. Defendants in turn filed a "Cross-Motion for Summary Judgement." ECF No. 94. Plaintiffs object to Defendants' characterization of the two motions, asking the court to instead "consider the parties' respective briefings to be briefings concerning what remedies Plaintiffs are entitled to *after* prevailing on summary judgment." ECF No. 104 at 3.

Plaintiffs' argument incorrectly assumes that the court has already ruled that Defendants' post-remand denial was improper. The court did indeed grant summary judgment already, but it then remanded the case back to Defendants to conduct a renewed evaluation. *See* ECF No. 80 at 17. Now that Defendants have done so, and Plaintiffs have moved to re-open the case, the court properly considers whether either party is entitled to summary judgment based on the renewed, post-remand evaluation. Furthermore, whether or not Defendants adhered to the court's remand strictures will be considered in the court's analysis, but any alleged non-compliance by Defendants does not automatically shift the procedural posture to a consideration of remedies. *See, e.g.*, *Colby*

*v. Assurant Emp. Benefits*, 818 F. Supp. 2d 365, 381–82 (D. Mass. 2011), *aff'd sub nom. Colby v. Union Sec. Ins. Co. & Mgmt. Co. for Merrimack Anesthesia Assocs. Long Term Disability Plan*, 705 F.3d 58 (1st Cir. 2013) (factoring an administrator's disregard of the court's remand order into whether the administrator acted arbitrarily and capriciously post-remand).

After all, it is customary in ERISA cases for district courts to review cross-motions for summary judgment post-remand. *See Graham O. v. United Behav. Health*, No. 1:18-CV-31-TS, 2024 WL 170739, at *1 (D. Utah Jan. 16, 2024). In addition, Plaintiffs, in their motion to re-open, even specifically moved for the case to be re-opened "for purposes of granting the contemporaneously filed *motion for summary judgment*." ECF No. 82 at 1 (emphasis added). The court thus treats these two motions as cross-motions for summary judgment.

## A. Standard of Review

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). However, when both parties move for summary judgment in an ERISA proceeding focusing on a benefit denial claim, the parties have effectively "stipulated that no trial is necessary" and thus "summary judgment is merely a vehicle for deciding the case." *See LaASMAR v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (citation omitted). In these instances, "the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor." *Id.* (citation omitted).

When a claim administrator holds discretionary authority to determine benefits eligibility, a reviewing court applies "a deferential standard of review, asking only whether the denial of

16

benefits was arbitrary and capricious." *Weber v. GE Grp. Life Assurance Co.*, 541 F.3d 1002, 1010 (10th Cir. 2008) (citations omitted). An administrator with discretionary authority may delegate its discretion to a third party, whose denial decisions are then also reviewed under an arbitrary and capricious standard. *Geddes v. United Staffing Alliance Employee Medical Plan*, 469 F.3d 919, 926–27 (10th Cir. 2006).

The parties dispute whether this deferential standard of review applies. Defendants argue that the court should continue to apply it in these post-remand proceedings. ECF No. 93 at 23. Plaintiffs ask the court to review these post-remand denials *de novo*. ECF No. 104 at 24. Plaintiffs' argument relies on their view of the procedural posture: that the court should consider these proceedings to be determining remedies post summary judgment rather than to be deciding on cross motions for summary judgment. *Id.* Having concluded that the proceedings are indeed cross-motions for summary judgment, the court applies the deferential standard of review. *See Torrey v. Qwest Commc'ns Int'l, Inc.*, 838 F. Supp. 2d 1201, 1209 (D. Colo. 2012) (applying the arbitrary and capricious standard post-remand); *McMillan v. AT&T Umbrella Benefit Plan No. 1*, No. 14-CV-717-GKF-PJC, 2017 WL 3478482, at *4 (N.D. Okla. Aug. 14, 2017), *amended in part*, No. 14-CV-717-GKF-PJC, 2017 WL 4407935 (N.D. Okla. Oct. 4, 2017), *and aff'd*, 746 F. App'x 697 (10th Cir. 2018), *and aff'd*, 746 F. App'x 697 (10th Cir. 2018) (same).

Claim denials are upheld on arbitrary and capricious review if "reasonable and supported by substantial evidence." *D. K. v. United Behavioral Health*, 67 F.4th 1224, 1235 (10th Cir. 2023) (citing *Adamson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006)); *see also David P. v. United Healthcare Ins. Co.*, 77 F.4th 1293, 1308 (10th Cir. 2023) (quoting *Graham v. Hartford Life & Acc. Ins. Co.*, 589 F.3d 1345, 1358 (10th Cir. 2009)) ("We define substantial evidence as 'such evidence that a reasonable mind might accept as adequate to support the

17

conclusion reached by the decision-maker. Substantial evidence requires more than a scintilla but less than a preponderance.'"). A coverage decision lacks substantial evidence if it rejects and fails to explain why it disagrees with opinions from a plaintiff's medical providers, *D. K.*, 67 F.4th at 1238–42, if it fails to sufficiently explain its conclusions with supportive reasoning and citations to the record, *id.* at 1242–43, or if it "is not grounded [on] any reasonable basis[,]" *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1193 (10th Cir. 2007) (citations and internal quotation marks omitted), *abrogated on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008).

A coverage decision's reasonableness is further judged on whether it resulted from a "reasoned and principled process." *D. K.*, 67 F.4th at 1236 (quoting *Flinders*, 491 F.3d at 1193). To avoid having their claim denials found arbitrary and capricious, ERISA administrators are obliged to engage in a "full and fair review" of benefits claims and appeals, considering the insured's records and sufficiently explaining their decision. *See* 29 C.F.R § 2560.503-1(h)(2)(iii)–(iv). "ERISA denial letters play a particular role in ensuring full and fair review[,]" so "[a] district court [is] correct to focus its review on the denial letters" when evaluating whether an insurer conducted a full and fair review. *D. K.*, 67 F.4th at 1239.

To avoid a finding that a denial of benefits was arbitrary and capricious, ERISA administrators must engage in "reasonable, 'meaningful dialogue'" in the denial letters they issue. *Id.* at 1240. Meaningful dialogue requires denial letters to be "comprehensive and include requests for additional information, steps claimants may take for further review, and specific reasons for the denial." *Id.* at 1239 (citing 29 C.F.R. § 2560.503-1(f)(3); 29 C.F.R. § 2560.503-1(h)(3), (4)). In accordance with ERISA's objective of facilitating meaningful dialogue regarding benefits denials, courts limit their review of Defendants' claim denials to the information conveyed to

Plaintiffs in the prelitigation and post-remand claims and appeals process. *See Ian C. v. UnitedHealthcare Ins. Co.*, 87 F.4th 1207, 1226 (10th Cir. 2023) ("Finally, United insists that its reviewers' internal notes are properly a part of the administrative record for Ian C.'s claim. Our recent disposition in *D. K.* forecloses this argument. . . . Only the rationales articulated to the beneficiary in the denial letter are eligible for review[.]").

### B.      Defendants' Post-Remand Denials

Plaintiffs argue the post-remand denials were arbitrary and capricious because (1) Defendants failed to follow the court's remand guardrails and (2) the record establishes that Kate's treatment was medically necessary as of April 18, 2016 (the date of her admission into Chrysalis). The court addresses each argument in turn.

### 1)  Defendants' Compliance with the Court's Remand Instructions

Plaintiffs' first argument is that Defendants ignored the court's remand instructions and that the court should accordingly award benefits to Plaintiffs. Defendants, for their part, do not contest that their post-remand denials blatantly ignored the guardrail instructions the court set. *See* ECF No. 93 at 37–44. Instead, they argue against those instructions, asserting they go against Tenth Circuit precedent. *See, e.g.*, *id.*; *see also* ECF No. 93 ¶ 27 (Defendants stating that "[t]he Court's safeguards were not immediately appealable because the remand order was not a final order . . . .").

Given this disregard for the court's order, the court's decision would seemingly be an easy one at this stage. After all, court orders cannot be ignored simply because a party disagrees with them or believes them to be unsound. *See Cooper v. Aaron*, 358 U.S. 1, 24 (1958) (Frankfurter, J., concurring) ("Criticism need not be stilled. Active obstruction or defiance is barred."); *United States v. Jefferson*, No. 3:25CR160 (DJN), 2026 WL 145277, at *6 (E.D. Va. Jan. 20, 2026)

("Simply flouting a judicial order because of a disagreement of 'interpretation' and acting like that order does not exist is simply not an option."). Moreover, a failure to abide by a court's remand order may by itself make any post-remand decisions arbitrary and capricious. *See Colby v. Assurant Emp. Benefits*, 818 F. Supp. 2d 365, 384 (D. Mass. 2011) ("In light of USIC's failure to abide by, as well as its continued resistance to, the Order in *Colby I,* this Court now awards Dr. Colby retroactive LTD benefits . . . ."); *Aisenberg v. Reliance Standard Life Ins. Co.*, 718 F. Supp. 3d 480, 490 (E.D. Va. 2024) ("As a general rule, on the remand of a case after appeal, the agency from which appeal is taken must comply with the mandate of the court and obey the directions therein without deviation. . . . This directive, which applies full-well to Defendant, was not followed. . . . [D]isregarding the Court's directives may — standing alone — amount to an abuse of discretion . . . .").

What makes Defendants' post-remand actions all the more striking is that they had other options they could have pursued. For example, they could have followed in good faith the remand process the court set out and appealed any final decision. If they wanted more immediate relief, they could have simply moved for the court to reconsider its prior order. *See* Fed. R. Civ. P. 54(b); *Romero v. Core Civic, Inc.*, No. 1:21-CV-544 KG/KRS, 2022 WL 17360324, at *2 (D.N.M. Dec. 1, 2022) ("Reconsideration of an interlocutory order is a matter of the Court's discretion . . . ."). The court is hard pressed to understand Defendants' actions up to this point and is well within its discretion to base its holding on this non-compliance alone.

Nevertheless, upon further reviewing the relevant case law, the court finds that its initial remand instructions were too restrictive—a decision, it is worth emphasizing again, that could have been reached upon a motion for reconsideration. In the court's prior order, the court grappled with two then-recent Tenth Circuit decisions. *See Anne A. v. United Healthcare Ins. Co.*, No.

20

220CV00814JNPDAO, 2024 WL 1307168, at *10 (D. Utah Mar. 26, 2024). First, in May 2023, the Tenth Circuit ruled in *D. K. v. United Behav. Health*, 67 F.4th 1224 (10th Cir. 2023), *cert. denied*, 144 S. Ct. 808 (2024). The panel held that a court can award benefits and forego remand "when the record shows that benefits should clearly have been awarded by the administrator" or "if a plan administrator's actions were clearly arbitrary and capricious." *Id.* at 1243. Ultimately, the panel held that "[c]onsidering the administrator's clear and repeated procedural errors in denying this claim, it would be contrary to ERISA fiduciary principles to mandate a remand and provide an additional 'bite at the apple.'" *Id.* at 1244.

But just a few months later, in August 2023, the Tenth Circuit ruled in *David P. v. United Healthcare Ins. Co.*, 77 F.4th 1293 (10th Cir. 2023), reversing an award of benefits. This panel stated that, "[g]enerally, '[r]emand is appropriate if the administrator failed to make adequate factual findings or failed to adequately explain the grounds for the decision.' . . . 'But if the evidence in the record clearly shows that the claimant is entitled to benefits, an order awarding such benefits is appropriate.'" *Id.* at 1315 (citation modified). Because the panel found that UBH failed to consider all of the evidence, failed to adequately explain its decision, and failed to engage with the plaintiffs, the court decided remand was proper for further consideration. *Id.* Though citing to *D. K.* at various points within the ruling, the panel did not engage with *D. K.*'s award of benefits within its remedy analysis.

What remains unclear, then, is if the Tenth Circuit has adopted a procedural basis for awarding benefits (where the administrator has acted arbitrarily and capriciously by committing clear and repeated procedural errors), in addition to its clearly recognized substantive basis for awarding benefits (when the record is clear they are due). And if a procedural basis has been adopted, as would be suggested by the Tenth Circuit's ruling in *D. K.*, it remains unclear what level

of procedural violations warrant an award of benefits.

District courts in this circuit have accordingly varied in their approach to these two cases, with some adopting the procedural basis and others not. *Contrast IAN C v. United Healthcare Ins.*, No. 2:19-CV-474-HCN, 2024 WL 3415890, at *2 (D. Utah July 15, 2024) ("Additionally, in very limited circumstances, a court can award benefits if a plan administrator engaged in 'clear and repeated procedural errors' when denying a claim."), *and S.K. v. United Behav. Health*, No. 2:18-CV-880-RJS-DBP, 2023 WL 7221013, at *34 (D. Utah Sept. 29, 2023) ("Benefits may also be awarded if an administrator's actions 'were clearly arbitrary and capricious,' or if remand would simply be an 'opportunity to retool a defective system,' or give 'an additional 'bite at the apple' to ERISA administrators acting unjustly.'") (citation modified), *with S.B. v. Blue Cross Blue Shield of Illinois*, No. 2:22-CV-336-AMA, 2025 WL 327920, at *13 (D. Utah Jan. 29, 2025) ("Upon a finding that BCBS acted arbitrarily and capriciously two remedies are available: remand or an award of benefits. Under Tenth Circuit precedent remand is the default unless the court determines that the record clearly shows that the plaintiff is entitled to benefits. *See David P.*, 77 F4th at 1315–16. But that default usually arises in the context of a denial based upon medical necessity—an issue not presented here.").

Animating much of this divergence in approach is a concern that the remand process provides an additional "'bite at the apple' to ERISA administrators acting unjustly," at a significant cost to plan claimants. *See S.K. v. United Behav. Health*, No. 2:18-CV-880-RJS-DBP, 2023 WL 7221013, at *34 (D. Utah Sept. 29, 2023) (quoting *D. K.*, 67 F.4th at 1243). Indeed, courts have long been skeptical of plan administrators devising and deploying post hoc arguments and rationales in litigation to "shore up" claim denials. *Univ. Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 848 n.7 (6th Cir. 2000); *see Halpin v. W.W. Grainger*, *Inc.*, 962 F.2d 685, 696

22

(7th Cir. 1992) (stating ERISA and its regulations "were not intended to be used . . . as a smoke screen"); *Spradley v. Owens-Illinois Hourly Emps. Welfare Ben. Plan*, 686 F.3d 1135, 1140 (10th Cir. 2012) ("[W]e will not permit ERISA claimants denied the timely and specific explanation to which the law entitles them to be sandbagged by after-the-fact plan interpretations devised for purposes of litigation."). Yet, the remand process and the additional "bite" that it provides appears to enable much of the same behavior.

Fundamentally, ERISA mandates that Plan administrators provide claimants with a "full and fair review." 29 U.S.C. § 1133(2). Nevertheless, in many cases, United Healthcare and other claim administrators appear to be reviewing claims in a less than full and seemingly unfair manner. *See Dwyer v. United Healthcare Ins. Co.*, 115 F.4th 640, 650 (5th Cir. 2024) ("We therefore join a growing number of decisions rejecting similar denial letters issued by United across the country."). Plan claimants who pursue already costly litigation then face an additional burden at the remand stage: having to rebuff denial rationales that should have been available to them often years prior when their ability to marshal contrary evidence from contemporaneous medical provider opinions was still fresh.

The court is sympathetic to Plaintiffs' argument that the current remand process appears to incentivize plan administrators to provide cursory, violative denial letters that simply state the treatment was not medically necessary. Few claimants have the resources or ability to pursue litigation, and even when facing review by a court, the plan administrators are then able to rectify their procedural violations on remand, facing a hamstrung claimant.

These process considerations inform how courts structure remand orders. Upon remand, courts often order that administrators must review claims for "further, and proper, consideration." *David P.*, 77 F.4th at 1315. Courts also restrict the remand analysis, generally barring consideration

of new rationales not raised in the administrative record. *See id.* ("Our remand, however, does not 'provide the plan administrator the opportunity to reevaluate a claim based on a rationale not raised in the administrative record,' . . . and not previously conveyed to Plaintiffs.") (internal citations removed).

In its prior order, the court construed its limit on raising new rationales to include a limit on citing to evidence not cited before. In certain contexts, this additional restriction would help to tailor the remand process to focus solely on the substantive arguments previously conveyed to claimants. In this case, however, the restriction encumbered Defendants' ability to conduct a proper review of the claims, most prominently because Defendants completely failed to cite to the record in their initial denials. Because remand instructions should encourage attention to the substantive issues without unduly constraining the process, the court will not enforce its previously stated limit on citations to the record when reviewing Defendants' post-remand denials. But the court continues to adhere to the limit on new rationales, which the Tenth Circuit has endorsed. *See id.*

### 2) Defendants' Post-Remand Denials Were Not Arbitrary and Capricious

Reviewing Defendants' post-remand denials under the arbitrary and capricious standard, the court finds that the post-remand denials were "reasonable and supported by substantial evidence." *See D. K.*, 67 F.4th at 1235 (citing *Adamson*, 455 F.3d at 1212).

The court first considers if Defendants' letters raised any new rationales that were not previously conveyed to Plaintiffs. Plaintiffs argue that Defendants did in fact rely on new rationales. Plaintiffs assert that the "new specific reasons" Defendants now rely on to deny the claims include (1) "new citations to evidence in Kate's records," (2) "new rationales why Kate's treating clinicians were not convincing years ago when they said she needed residential treatment," and (3) "a new analysis of Kate's condition using an entirely new analytical tool." ECF No. 105 at

24

9.

With respect to Plaintiffs' "new citations" argument, the court has already explained why its prior statement that it will not consider new citations to existing evidence in the record was problematic. But the evidentiary support cited in the post-remand denial letters was not used to bolster any new rationales in the court's view. The post-remand denials continued to assert that Kate's treatment at Chrysalis was not medically necessary because the reviewing providers (1) did not believe the intensity of services was required and (2) did not believe that her condition could not be safely, efficiently, and effectively assessed and/or treated in a less intensive level of care. ECF 83-1 at 8. The court also refrains from treating the post-remand engagement with Kate's doctors' opinions as raising a new rationale since the court previously faulted Defendants for not engaging with the medical opinions in the pre-litigation process.

The court does however agree with Plaintiffs that Defendants' reliance on an entirely new analytical framework, the CALOCUS-CASII Guidelines, rises to the level of a new rationale not previously conveyed to Plaintiffs. Claimants often explicitly rely on the relevant guidelines when crafting their arguments in the pre-litigation and litigation process. Allowing a plan administrator to justify a denial on a new framework after consistently relying on a prior framework for years would disadvantage claimants, potentially allowing administrators "interminable opportunities to search for alternative grounds to deny benefits." *Spradley*, 686 F.3d at 1142. Nevertheless, the final post-remand reviewer, Dr. Cristobal, stated that "[f]or the sake of simplicity, [he would] focus mostly on the Optum Criteria and how they apply to this case" and that "[his] analysis provided in the 'Rationale' section would be the same regardless of the guidelines applied." ECF No. 83-1 at 4. Thus, the impact of the court's exclusion of analysis tied to the CALOCUS-CASII Guidelines is limited.

Having resolved the matters appropriate for consideration on remand, the court turns to the actual denial of benefits based on medical necessity. Plaintiffs argue that the record establishes that Kate's treatment was medically necessary as of April 18, 2016, the date of her admission into Chrysalis. ECF No. 104 at 28. They argue that under the Optum LOC RTC Guidelines, Kate's condition could not have been safely, efficiently, and effectively assessed and/or treated in a less intensive level of care. *Id.* at 29. Plaintiffs point to Dr. Dunn's observations that she would need "near constant observation." *Id.* (citing ECF No. 54-6 at 531). They further argue that Dr. Dunn's opinion also supported that Kate was at risk of harm to self, though they concede it was perhaps not an imminent risk. ECF No. 104 at 31. They further argue that outpatient therapy was an insufficient solution, again citing Dr. Dunn's letter. *Id.* at 31 (citing ECF No. 54-6 at 530–32).

Despite Plaintiffs' contentions, Defendants' post-remand denial letters "[were] predicated on a reasoned basis." *Ellis v. Liberty Life Assurance Co.*, 958 F.3d 1271, 1290 (10th Cir. 2020) (quoting *Adamson*, 455 F.3d at 1212). The letters explained their conclusions, cited to the record, and most relevant to Plaintiffs' arguments, explained why Defendants disagreed with Dr. Dunn's observations and recommendations. Specifically, the post-remand denial letters asserted that Dr. Dunn's recommendations were "temporally irrelevant" because they spoke to Kate's clinical history from 2015, rather than from April 2016, the date of her admission to Chrysalis. ECF No. 83-1 at 10; ECF No. 93-1 at 10. In further disagreeing with Dr. Dunn's recommendations, the post-remand reviewers also placed significant weight on Kate's condition and apparent improvement following her second stint at BlueFire, prior to her Chrysalis treatment. The court is unable to conclude that these reasons, which were clearly articulated and addressed Plaintiffs' arguments and evidence, were not reasonable. The court thus has no basis to find Defendants' post-remand denials to be arbitrary and capricious.

26

The court therefore GRANTS Defendants' motion for summary judgment and DENIES Plaintiffs' motion for summary judgment.

## III.    Attorney's Fees

The court finally turns to Plaintiffs' motion for attorney's fees.[11] As the Tenth Circuit has described, "ERISA contains a limited fee-shifting provision in § 1132(g). In relevant part, it states: '[i]n any action under this subchapter . . . by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.'" *Stark v. Reliance Standard Life Ins. Co.*, 142 F.4th 1252, 1258 (10th Cir. 2025). "'A fee claimant need not be a prevailing party to be eligible for an award of attorney's fees and costs under ERISA.' Instead, a district court has the discretion to award fees 'as long as the fee claimant has achieved some degree of success on the merits.'" *Lightfoot v. Principal Life Ins. Co.*, 547 F. App'x 864, 866 (10th Cir. 2013) (citation modified).

District courts may consider five factors in exercising their discretion: "(1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of fees; (3) whether an award of fees would deter others from acting under similar circumstances; (4) whether the party requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions." *Id.* But the Tenth Circuit has also ruled that "under § 1132(g), attorney's fees are unavailable for pre-litigation administrative proceedings." *Stark*, 142 F.4th at 1258.

The court exercises its discretion to award attorney's fees to Plaintiffs for both the pre-

---

[11] Plaintiffs' motion for summary judgment (entitled a "Renewed Motion for Benefits, Attorneys' Fees, Prejudgment Interest, and Costs") also contains a request for an award of fees, interest, and costs.

remand and post-remand litigation. Here, Plaintiffs initially prevailed on summary judgment, achieving success on the merits based on Defendants' refusal to engage in meaningful dialogue and a full and fair review with Plaintiffs as required by ERISA. The current proceedings continue to reflect that procedural history, only required because of Defendants' prior arbitrary and capricious conduct. The court also finds that an award of attorney's fees would serve an important deterrence function with respect to the ERISA process. Requiring plan administrators to pay attorney's fees after engaging in violations of the ERISA process, even when later rectifying those issues post-remand, will incentivize plan administrators to engage in a full and fair review in the first instance.

## CONCLUSION

For the above reasons, the court hereby ORDERS:

1. Plaintiffs' motion for leave to file surreply is GRANTED. ECF No. 109.

2. Plaintiffs' motion to reopen the case is GRANTED. ECF No. 82.

3. Defendants' motion for summary judgment is GRANTED. ECF No. 94.

4. Plaintiffs' "Renewed Motion for Benefits, Attorneys' Fees, Prejudgment Interest, and Costs" is DENIED in part and GRANTED in part. ECF No. 83. Plaintiffs are not awarded benefits but are awarded attorney's fees and costs. Plaintiffs may submit their claim for fees and costs in a separate motion, which should include a fee affidavit.

Signed March 24, 2026.

BY THE COURT

_____

Jill N. Parrish
United States Chief District Judge